IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
AT MEMPHIS

BOAZ PLEASANT-BEY,
    PLAINTIFF

V.

No.:_____

**JURY TRIAL DEMANDED**

RECEIVED

JAN 0 3 2025

Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN. Memphis

CORECIVIC, FKA: CORRECTIONS CORPORATION OF AMERICA, ET AL.,
    DEFENDANTS.

COMPLAINT

COMES NOW, the Plaintiff, respectfully submitting his complaint under 42 U.S.C. § 1983 against the following Defendants—suing them within their individual and official capacities: (1) CoreCivic ("CC") formally known as: "Corrections Corporation of America" (hereinafter: "CC/CCA"), for: (i) having policies/customs permitting criminal defense lawyers, foreman of the Shelby County Grand Jury, Criminal Court Clerk, State criminal court judges, prosecutors, appellate judges and justices, and State lawmakers, all having relations either framing the State criminal law indicting him of a criminal offense, or having direct involvement with his criminal case, while—simultaneously having financial investments with the CC/CCA's "prison-for-profit" business model—creating financial conflicts interests with those persons as either lawmakers or their roles/functions in the State Criminal Court proceedings in Tennessee involving his criminal case—subsequently violating his federal constitutional and federal rights in criminal proceedings; (ii) For misconduct of those CC/CCA investors in the CC/CCA prison-for-profit business model's—while personally having direct involvement in Plaintiff's criminal case, while simultaneously acting as private investors for the CC/CCA prison-for-profit business model in his criminal case—violating his constitutional rights in criminal proceedings; and (2) The Tennessee Department of Corrections [TDOC] and CC/CCA, for violating Plaintiff's constitutional rights under: (a) *T.C.A. §4-1-407 (b), (c)(1)-(2) and (e)*; (b) *28 U.S.C. § 2000cc-1(a)-(b)*; and (4) For the CC/CCA violating Plaintiff's *rights under U.S. Const. Amend. I, VIII, and XIV,§ 1.* The Plaintiff does not sue TDOC under the U.S. Const. as an agent of the State of Tennessee, but does sues TDOC under *T.C.A. §4-1-407 (b), (c)(1)-(2) and (e)*, permitting monetary damages for injuries thereunder—and *28 U.S.C. § 2000cc-1(a)-(b)* for injunctive and declaratory relief. Plaintiff proceeds with the following:

1

## I.    PARTIES & JURISDICTION

1.) Plaintiff: Boaz Pleasant-Bey No.: 473110, the Plaintiff, Owner of a business in Hickman, County Tennessee: The Pleasant-Bey Legal Initiative, From: The Pleasant-Bey Files. The Pleasant-Bey Legal Initiative, currently resides at: SCCF, 555 Forrest Avenue, Clifton, Tenn. 38425

2.) The Tennessee Department of Corrections [TDOC] is located at the Rachel Jackson Building 6th Floor, 320 6th Avenue North, Nashville, Tenn. 37243.

3.) CC/CCA is a Maryland corporation headquartered in Tennessee, with its principal place of business at 10 Burton Hills Boulevard, Nashville, Tennessee. It is a for-profit, publicly traded (NYSE:CXV) real estate investment trust that "specializes in owning, operating, and managing prisons and other correctional facilities", and has referred to itself as the nation's "largest owner of partnership correction and detention facilities and one of the largest prison operators in the United States. It operates South Central Correctional Facility (SCCF) and other Tennessee facilities under the full authority of the State of Tennessee pursuant to Tenn. Code Ann. §§ et seq. And/or 41-8-101 et seq. At all relevant times to Plaintiff's complaint, CC/CCA was acting under color of state law. Currently, CC/CCA is a "prison for profit" corporation, permitting Criminal Defense Lawyers, State Criminal Court Judges and State's Attorney Generals to invest in its Corporation despite the conflict of interest in functioning as advocates and impartial entities associated with the Criminal Justice System. CC/CCA is licensed to do business in Tennessee and may be served through its registered agent, CT Corporation System, 300 Montvue Rd. Knoxville, Tenn 37919-5546.

4.) Jurisdiction: This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it is based upon the laws and constitution of the United States. The issues in this cause are cognizable within the Venue of this District under 28 U.S.C. § 1391(b)(1). This Court has the authority to grant both injunctive relief under Fed. R. Civ. Proc. 65, and declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. Proc. 57.

## II.    ADMINISTRATIVE REMEDIES

5.) The Plaintiff has exhausted all of his grievance remedies concerning this issue. There are no more administrative remedies for him to exhaust with respect to this cause. Grievance remedies are deemed exhausted when correction officials fail to timely respond to a properly filed grievance. *Ross V. Blake*, 578 U.S. 632, 644 (2016) (Exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."); *Boyd V.*

*Corrections Corporation of America*, 380 F. 3d 989, 996 (6ᵗʰ Cir. 2004) (citing cases); *TDOC Policy 501.1(VI)(C)(3)* ("...*The Level III response shall be sent to the grievance chairperson for distribution within 25 working days of the date the appeal was received. The chairperson shall enter the final decision on Grievance (LIBG). This response is final and is not subject to appeal.*") Plaintiff timely filed all his grievances in relation to this complaint, but received no responses from any of the superiors, the grievances pended with no response for months, holding up other subsequent grievances that were all timely filed and were not responded to within seven (7) days of him timely filing it because the CC/CCA continuously moves the Grievance Sgt./Chairperson at the SCCF prison for other duties other than her job assignment in an effort to frustrate the grievance process—to delay the filing of civil complaints against the corporation by inmate—litigants.

### III.    PREVIOUS LAWSUITS

6.) The Plaintiff has filed the following previous civil complaints: Pleasant-Bey V. Tenn. Dept. of Corr., 1:22-cv-00033 (M.D. Tenn.); Pleasant-Bey V. Shelby Co., et al., 2019 WL 11769343 (6ᵗʰ Cir.); Pleasant-Bey V. Tennessee Department of Corrections, et al., 2019 WL 11880267 (6ᵗʰ Cir.); Pleasant-Bey V. Shelby County Government, et al., 2019 WL 5654993 (W.D. Tenn.); Pleasant-Bey V. Tennessee, et al., 2020 WL 707584 (M.D. Tenn.);Pleasant-Bey V. Luttrell Jr., et al., 2021 WL 328882 (W.D. Tenn.)

### IV.    CHALLENGING CONSTITUTINALITY OF STATUTES

7.) This complaint challenges the constitutionality of the following law(s) of the State of Tennessee:

(a) Whether the Tenn. Code Ann. § 41-21-211 unconstitutionally violates the Free Exercise, Freedom of Religious Speech and Establishment Clause Clauses of the First Amendment and the Equal Protection Clause of the XIVth Amendment to the U.S. Constitution, and if so, does its legislative intent direct isolation of Christianity for special treatment—providing bibles—authorizing the TDOC and CC/CCA to mandate Christian book vendor(s)—while refusing to equally permit the same for Islam—violating the religious rights of the Plaintiff—a Muslim in the Tennessee Department of Corrections [TDOC] and CC/CCA prisons—establishing Christianity as the chosen religion for the TDOC and CC/CCA prisons—only hiring TDOC and CC/CCA Christian staff members and chaplaincy—while outsourcing an unislamic contract contracting an Imam for the governance of Islam in the TDOC?

3

(b) Whether it is unconstitutional, a financial conflict of interest with genuine legislative intent, and/or violates the federal and constitutional rights of the criminally accused in criminal proceedings, for members of the Tennessee General Assembly ["TGA"] to have financial investments with the CC/CCA *prison for profit business model*—while simultaneously framing and adopting criminal laws—that strategically expanding that business model by way of lengthy prison sentences—enlarging both their personal investments therewith —and enlarging the investments of the Tennessee Department of Treasury ["TDT"]—a CC/CCA invested agency, if so, or if not, did the language used to frame the Tenn. Code Ann. § 39-13-522 help the CC/CCA prison-for-profit business model in Plaintiff's state criminal case, by making it easy to convict him of that offense with no physical evidence—while sentencing him to large amounts of prison-time thereafter—after evidence existed of jealous motives of the accusing child—and both financial and jealous motives of her mother to press press that charge against him?

## V.    CERTIFICATION OF CONSTITUTIONAL CHALLENGE

8.) The Plaintiff has submitted a Notice of Certification of Constitutional Question to both the United States Attorney General and the Tennessee Attorney General in accordance with Fed. R. Civ. P. 5.1.

## VI.    FACTS

### CC/CCA Permitting Investors With Conflicting Interests

The CC/CCA Prison-for-Profit Business Model

9.) When Plaintiff arrived at South Central Correctional Facility (SCCF)a—a CC/CCA operated prison in September of 2024, a CC/CCA staff member exposed several internal secrets of CC/CCA, informing Plaintiff—showing documents to him—of the CC/CCA permitting everyone to invest in their "prison-for-profit' company business model—including, but not limiting: (i) criminal defense lawyers; (ii) judges,; (iii) prosecutors; (iv) the foreman of the Shelby County Grand Jury and Criminal Court Clerk, (vi) the lawmakers of the General Assembly of the State of Tennessee—all having direct financial investments and personal involvements within their official capacities in the Tennessee criminal justice system in the creation of, and the adjudication of, criminal laws—for over twenty years. The said Staff member showed Plaintiff a long list

---

1    "In its 2023 annul report, CoreCivic leadership boasted to shareholders of 'a positive progression in our population and occupancy levels.'...Full  prison beds mean more money for the corporation---and higher stock value to boost State Treasury hold ings." Ex. 4. *Tennessean News Article on CC/CCA ('Hereinafter referred to as: "**the prison-for-profit business model***')

of CC/CCA investors in Tennessee, of which he noticed the names of people invested in that company who were also direct actors in his criminal case of which he is suing CC/CCA for violations of his constitutional rights in criminal proceedings. Plaintiff, a student of the Adams's State University Paralegal Course, sponsored by civil lawyer: Tricia Herzfeld, observed that the discovery rule applied that that point after he visually saw these names and realizing that these facts directly affected his criminal case. Plaintiff then took the requisite preparations to file this complaint in Federal District Court—suing the CC/CCA for its policies/customs permitting criminal defense lawyers, judges, criminal court reporters, state appellate judges and justices, prosecutors, criminal court clerk, foreman of the grand jury, and the State lawmakers—to simultaneously act as actors in the state criminal justice system while maintaining financial investments in the CC/CCA's *prison-for-profit business model,* causing financial conflicts of interests with those individuals and his criminal case, the framing of the laws affecting his case, and with the criminal justice system in Tennessee itself, subsequently depriving him of federal constitutional rights to Due Process, Equal Protection, a speedy and fair trial, effective assistance of counsel, an impartial judge, prejudicing his rights to liberty, and to both cruel and unusual punishment. In the CC/CCA prison-for-profit business model, *the more people in prison with lengthy sentences, the more profit for the business model. The less people in prison with lengthy sentences, the less profit for the business model. Anti n.1* This business model motivates CC/CCA to take these extreme measures to permit State legislative officials—and the State Treasury Department, an agency of the Legislative Branch of Tennessee—to invest in its prison-for-profit business model—thereby insidiously influencing Tennessee legislature to create and pass laws (Tenn. Code Ann. § 39-13-522, et al.,) financially motivated by CC/CCA that assist CC/CCA to achieve its *prison for profit* business model agenda—legally establishing easy to obtain lengthy prison sentences to overstock. And overcrowd Tennessee prisons. Once the prisons become overstocked/overcrowded with convicted criminals having lengthy prison sentences, the CC/CCA builds more private—operated prisons to house more people, hired by the State of Tennessee, increasing the companies business agenda: "prison for profit", allowing the company to expand by increasing profits at the expense of easily obtained criminal convictions and lengthy sentences to the Tenn. Department of Treasury. Tenn. Lawmakers, criminal defense lawyers,, prosecutors, judges and criminal court reporters can all financially benefit—having stock investments with the CC/CCA *prison-for-profit business model.* The more prisons with people in them serving lengthy prison sentences, the better the business model agenda is fulfilled, and the more money CC/CCA makes! For this reason, Tennessee State laws will have longer-prison sentences in the future because its better for business—not because it helps to reform the criminals who are convicted of committing those offenses. CC/CCA as a

private corporation whose actions have deprived Plaintiff of federal and constitutional rights can be held liable under § 1983 because its policies/customs permitting those persons to invest in its business model have a nexus in violation of his federal and constitutional rights. Plaintiff is not suing those persons in their individual capacities due to the *Heck V. Humphrey* discrepancy, but sues CC/CCA in its individual capacity for secretly causing a major financial conflict of interest with those State actors in his criminal case:

State's Injury Theory

10.) Plaintiff was indicted for violating Tenn. Code Ann. § 39-13-522 alleging he raped his seven (7) year old step-daughter between July 2005—October 2006 in the case *State V. Pleasant-Bey*, 07-00441 in Shelby County, Tennessee, Criminal Courts. Plaintiff's indictment was influenced and signed by CC/CCA investor —Foreman of the Shelby County Grand Jury, Mary F. Thomas, who personally was before the Shelby County Grand Jury that returned the indictment in his case—charging him with one count of Tenn. Code Ann. § 39-13-522--as she simultaneously maintained investments with the CC/CCA prison-for-profit business model—using her official capacity as the Grand Jury's Foreman to influence that Grand Jury to return a "True Bill" as a means to further her investments with the CC/CCA prison-for-profit business model. That indictment returned by the Shelby County Grand Jury—signed by Thomas was then signed by William Gibbons—Shelby County District Attorney General, 30th Judicial District who also used his official capacity as a District Attorney General to return an indictment charging him with the Tenn. Code Ann. § 39-13-522 to further is personal investments with the CC/CCA prison-for-profit business model. That indictment was then stamped "FILED" by: CC/CCA investor—William R. Key, Shelby County Criminal Court Clerk who simultaneously maintained investments with the CC/CCA prison-for-profit business model —using his official capacity to stamp "Filed" Plaintiff's indictment—to further his investments with the CC/CCA prison-for-profit business s model. Plaintiff was subsequently indicted subsequent to those CCCCA investors actions. Upon Plaintiff's arrest in Jan. 2007, in Baltimore, Maryland, he was transferred to the Shelby County Jail where he awaited trial in Feb. of 2007 to answer that indictment. Upon his arraignment, he was prosecuted on *"The State's Injury Theory"*. The State's Injury Theory purported by CC/CCA investors/prosecutors William "Gibbons"--District Attorney General, Marianne L. "Bell"-Assistant District Attorney, and J.R. Carter-Assistant District Attorney (now Judge Carter), consisted of the prosecution's intentional suppression of the child witness' medical examination records taken at the Le Bonheur Hospital on Oct. 24th, 2006 ("LBH reports") revealing no injuries to her genitalia, while furnishing him with a discovery pack of evidence of the child witness' medical examination reports from her Memphis

Sexual Assault Resource Center ("MSARC") diagnosis on November 3rd, 2006, revealing hymen notches at

10:00 and 2:00. The child witness had not been in Plaintiff's custody since October 22nd, 2006. The State's

Injury Theory accused Plaintiff of sexually penetrating the child witness' vagina with his finger and tongue,

and penetrating her anus with his finger and tongue, leaving the hymen notches as evidence of him sexually

penetrating her vagina. CC/CCA investors Gibbons, Bell, and Carter's deliberate suppression of the child

witness' LBH reports over the Plaintiff's Pro Se requests while he was represented by three (3) separate court

appointed lawyers was the basis of them planning to prove at trial that she sustained injuries in support of

her accusations against him. Upon Plaintiff's arrest, he informed his criminal defense lawyers that the child

witness' mother informed him that the child witness was taken to the LBH on Oct. 24th, 2006 and she was

diagnosed with no injuries to her genitalia, and she also threatened him that she would not press charges on

him if he signed over his home having $66,000.00 of home equity to her. After Plaintiff refused to sign over

his home to her, she pressed charges on him and he was arrested in Baltimore, Maryland. The Plaintiff

eventually proceeded Pro Se on Jan. 25th, 2009 in his efforts to obtain LBH reports his CC/CCA invested

court appointed lawyers refused to obtain being suppressed by CC/CCA investors Gibbons, Bell, and Carter

that were needed to help him prove his innocence. Plaintiff filed a motion for exculpatory evidence while

Pro Se, specifically requesting for the suppressed LBH reports, and CC/CCA invested prosecutors said they

didn't have it. In desperation to obtain the LBH reports headed for trial on May 11th, 2009, Plaintiff filed a

complaint with the Federal Bureau of Investigations [FBI] against Gibbons, Bell and Parker for conspiring

to take hi to trial on the State's Injury Theory while suppressing the LBH reports. After being appoint three

(3) CC/CCA invested court appointed lawyers, the Pro Se Plaintiff was able to obtain the suppressed LBH

reports from CC/CCA investor Bell on April 13th, 2009. She also provided several other exculpatory and

exonerating statements in discovery to him after his Pro Se complaint against her and CC/CCA investors

Gibbons and Parker with the FBI for conspiring to withhold the LBH reports while making efforts to force

him him to unwillingly plead guilty or face inevitable conviction at trial being prosecuted on the State's

Injury Theory with the suppressed LBH reports. After Plaintiff's CC/CCA—invested lawyers verbally

encouraged him to proceed Pro Se to obtain the exculpatory LBH reports and prepare his defense for trial.

CC/CCA investor Gibbons and Bell changed the State's Injury Theory to a different trial theory—purporting

the child never had any injuries to her genitalia and her anus was sexually penetrated by the Plaintiff—

demonstrating her lack of sympathy for the child—manifesting her hidden financial interests to obtain a

criminal conviction at any given cost for the purposes of increasing her personal investments with CC/CCA.

Plaintiff filed a motion to invoke the doctrine of judicial estoppel seeking to estopp CC/CCA investors

Gibbons and Bell from changing the State's theory—after they finally furnished him with the exculpatory evidence to him. However, CC/CCA investor Judge Colton denied that motion before trial.

### Appointment of CC/CCA Invested Lawyers

#### Appointment of CC/CCA Investor Clifford Abeles Jr.

11.) From Feb. of 2007-June of 2007. Defendant CC/CCA, permitted criminal defense lawyer Clifford Abeles Jr. to have financial investments with its "prison for profit" business model. Abeles' financial investments with CC/CCA's business model created a financial conflict of interest with the his role as Plaintiff's criminal defense lawyer, subsequently depriving Plaintiff of his Vth and XIVth amend. rights to Due Process, and Equal Protection, and his VIth Amend. Const. right to effective assistance of counsel to be represented by counsel having no conflicting interests. CC/CCA Investor Abeles represented Plaintiff in the case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division IV, from Feb. 2007 through June 2007 during the time-period Judge Caroline Wade Blackett was the presiding Judge. While representing Plaintiff. CC/CCA Investor Abeles refused to make reasonable efforts to obtain the known suppressed LBH reports from CC/CCA investors Gibbons, Bell and Carter. Plaintiff made CC/CCA Investor Abeles aware that  CC/CCA investors Gibbons, Bell Carter were intentionally suppressing the exculpatory LBH reports—while furnishing him with the MSARC reports—prosecuting him on the State's Injury Theory—and that injury theory would be refuted if the suppressed LBH reports were furnished to him in discovery. CC/CCA Investor Abeles' financial investments with CC/CCA negatively influenced his behavior as a criminal defense lawyer, causing him to work against Plaintiff: (1) CC/CCA investor Abeles refused to file a motion to dismiss Plaintiff's case after Abeles' appointment as Plaintiff's lawyer as requested by Plaintiff for not having a preliminary hearing under Tenn. R. of Crim. P. Rule 5(e)—and refused to obtain the exculpatory LBH reports and refusing to motion for speedy trial; while (2) giving Plaintiff a guilty plea offer from the CC/CCA investors Gibbons, Bell and Carter in an effort to assist the prosecution in obtaining a criminal conviction in the case; while (3) telling Plaintiff he will be tried on the State's Injury Theory without the LBH reports. After Plaintiff's complaints against his misbehavior, CC/CCA Investor Abeles filed motions he never intended to argue, verbally encouraged Plaintiff to proceed Pro Se to obtain the suppressed LBH reports or accept the guilty plea offer, then CC/CCA investor Abeles eventually withdrew as Plaintiff's Counsel due to a conflict of interest with him while CC/CCA Investor Abeles secretly concealed his financial investments with CC/CCA during that time-period. Abeles never

8

exposing his hidden financial conflicting interest with CC/CCA during the time-period he was Plaintiff's lawyer and he left a negative impression upon Plaintiff regarding court appointed criminal defense lawyers.

Appointment of CC/CCA Investor Larry E. Fitzgerald

12.) From of August of 2007—April of 2nd, 2008, Defendant CC/CCA's policies/customs permitted criminal defense lawyer: Larry E. Fitzgerald, to have financial investments with its "prison for profit" business model. CC/CCA investor Fitzgerald's financial investments with CC/CCA's business model created a financial conflict of interest with the his role as Plaintiff's criminal defense lawyer during that time. CC/CCA investor Fitzgerald's personal financial investments with CC/CCA negatively affected his representation of Plaintiff as Plaintiff's criminal defense lawyer by: (a) Offering Plaintiff guilty plea offers from CC/CCA investor Gibbons and Bell against his will; while (b) telling Plaintiff he would not make any efforts to obtain the LBH reports that were deliberately being suppressed by CC/CCA investors Gibbons and Bell—while Plaintiff was being prosecuted under The State's Injury Theory; (c) knowing he (CC/CCA investor Fitzgerald), CC/CCA investors Gibbons and Bell were all ignoring Plaintiff's Pro Se motions and written requests for it during the time-period he was being represented by CC/CCA investor Fitzgerald; and (d)–scheduling Plaintiff for trial on the State's Injury Theory on April 1st, 2008 without the LBH reports— keeping Plaintiff under the pressures of the above (a)-(c)–repeatedly telling Plaintiff: "You have to represent yourself Pro Se if you want to obtain suppressed exculpatory LBH reports from the State of Tennessee and prepare your defense for trial. Otherwise, just take the guilty plea offer Mr. Pleasant-Bey!" CC/CCA investor Fitzgerald represented Plaintiff as his criminal defense lawyer during that time-period in the case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division III. CC/CCA investor Judge John P. Colton Jr. was the presiding Judge in 2007-April 2nd, 2008. After Plaintiff filed complaints against CC/CCA investor Fitzgerald, for his malicious behavior and oppressive misrepresentation during the pre-trial proceedings. CC/CCA investor Fitzgerald withdrew as counsel due to a conflict of interest with Plaintiff. CC/CCA investor Fitzgerald left an irreparable damaging impression on Plaintiff's perspective of having legal representation in his criminal case, in addition to the previous misrepresentation of CC/CCA investor Abeles. Plaintiff desperately needed legal representation and sought to have one more defense lawyer represent him before taking those lawyers advice to proceed Pro Se.

9

Appointment of CC/CCA Investor John H. Parker

13.) From May of 2008 to May 29th, 2010. Defendant CC/CCA, policies/customs permitted criminal defense lawyer John H. Parker to have financial investments with its "prison for profit" business model. CC/CCA investor Parker's financial investments with CC/CCA created financial conflicts of interests between him and the Plaintiff while he represented the Plaintiff as his criminal defense lawyer and standby counsel during the pre-trial and trial proceedings of the trial of the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division III, VII, I, and VIII. Parker's financial investments with CC/CCA negatively affected his representation of Plaintiff by him: (a) offering Plaintiff guilty plea offers from CC/CCA investors Gibbons and Bell against Plaintiff's will; while (b)-refusing to motion for the exculpatory LBH reports knowingly suppressed by CC/CCA investors Gibbons and Bell as they prosecuted Plaintiff under the MSARC Injury Theory: (c) continuously encouraging Plaintiff to proceed Pro Se in order to obtain the suppressed LBH reports and prepare his defense and scheduling him for trial in October of 2008 and May 11th, of 2009; (d) verbally telling Plaintiff he will not help him, nor request for the LBH reports; (e) CC/CCA investor Parker filed several motions he said he never intended to argue, but agreed to have a hearing on the motion for bill of particulars. During that hearing on October 9th, 2008 before CC/CCA investor Judge Colton for bill of particulars. Parker confessed to CC/CCA investor Judge Colton (1) "And I don't want to sit there and say that the State is withholding anything from the Defendant"; and (ii) Parker said we're going to have to go through trial (under the State's Injury Theory elucidated by CC/CCA investor Bell at the Bill of Particular motion hearing—*without the LBH reports*) **have a negative result** (insinuating the trajectory of a guilty verdict). then find out that the State was withholding something from the Defendant after the trial; (f) On Jan. 25th, 2009. Plaintiff eventually took CC/CCA investor Parker's bad advice—waived his right to counsel. and proceeded Pro Se as he was headed for trial under the State's Injury Theory on May 11th, 2009 without the LBH reports—with the option to be represented by CC/CCA investor Parker without the LBH reports. (g) while Pro Se, Plaintiff filed a Pro Se motion for exculpatory evidence specifically requesting for the LBH reports and on Feb. 25th, 2009 CC/CCA investor Judge Colton had a hearing on the motion. Prior to the hearing. Plaintiff met with CC/CCA investor Parker privately and Plaintiff begged Parker to argue the motion for him because he felt uncomfortable representing himself. CC.CCA investor Parker told Plaintiff he'll be fine. encouraged Plaintiff to remain Pro Se and told Plaintiff he will whisper advice to him if needed. When the motion hearing occurred. CC/CCA investor Judge Colton said. "Motion for Exculpatory Evidence", and Parker whispered to Plaintiff. "Take it back! Take it back! Withdraw the

motion for exculpatory evidence!" Plaintiff was afraid, not knowing what to do and said, "I withdraw the motion!" The CC/CCA investor prosecutor at the hearing told CC/CCA investor Judge Colton, "The State doesn't have that evidence your honor." Plaintiff was still scheduled for trial on May 11[th], 2009 on the MSARC Injury Theory; (h) While under traumatic pressure, Plaintiff scraped the skin off of the side of his face from the pressures of the pre-trial proceedings, made a few attempts to hang himself to escape the mental oppressive trauma, but was unsuccessful in killing after his cellmate found him trying to kill himself. Plaintiff eventually filed a complaint with the FBI against CC/CCA investors Bell, Gibbons and Parker for conspiring to take him to trial under the State's Injury Theory while suppressing the LBH reports. Then, on April 13[th], 2009, Plaintiff was called to court when CC/CCA investor Bell furnished the LBH reports to Plaintiff and furnished Plaintiff with exculpatory statements of child witness confessing to accusing him of the accusations because Plaintiff *promised to make both her and her mother happy, but he only made her mother happy. Ex. 1, Trial Vol. II, Pg. 151;* (I) Plaintiff sustained psychological injuries during the time-period he was being represented by CC/CCA investor Parker—causing  Plaintiff to scrape the skin off of his face, attempt to hang himself, and even cut his left wrist in an attempt to commit suicide to escape the unwanted hardships of being forced to proceed Pro Se just to obtain relevant evidence necessary to help him to show the jury he was actually innocent of the offense charged. (j) Parker also told Plaintiff that he should remain Pro Se and told him he only needed to file a motion for new trial and a premature notice of appeal with it if he lost trial. Plaintiff followed Parker's advice and was never provided a direct appeal as of right after he lost trial. (k) Parker's representation as Plaintiff's criminal defense lawyer and standby counsel was a CC/CCA invested form of representation influenced by Parker's investments with CC/CCA with a hidden agenda to have Plaintiff convicted of the offense charged and sentenced to prison to  help with  CC/CCA's "prison for profit" business model agenda (l) After the jury's verdict, CC/CCA investor Parker turned to Plaintiff, smiled with the biggest smile Plaintiff ever saw on his face, saying: "Hey Boaz! It's all over with now! You're convicted! Don't drop the soap! And don't get brown on your nose!" These statements were all put inside of Plaintiff's motion for new trial attached with a sworn Pro Se Affidavit and were never rebutted by CC/CCA investor Parker, and were overlooked and disregarded by CC/CCA investor Christopher Craft, Shelby County Criminal Court Judge upon the CC/CCA invested hearing on the Plaintiff's motion for new trial.

### CC/CCA Invested Trial Judges & Appellate Judges

CC/CCA Investor John P. Colton., Jr.,

14.) From July of 2007-May 20th, 2010, Defendant CC/CCA's policies/customs permitted Judge John P. Colton Jr.
of Shelby County Criminal Court Division III to have financial investments with its "prison for profit"
business model. The CC/CCA "prison for profit" business model created financial conflicting interests with
CC/CCA Investor Judge John P. Colton Jr.'s profession as a Criminal Court Judge in Shelby County.
CC/CCA Investor—Judge Colton presided as Plaintiff's judge, made pre-trial rulings on motions during
Plaintiff's case that had a CC/CCA prison for profit agenda. CC/CCA investor Colton refused to dismiss
Plaintiff's case after discovering CC/CCA investors Gibbons and Bell's suppressed LBH reports and bogus
MSARC Injury Theory in Plaintiff's motion to dismiss for violations of due process and deprivation of right
to speedy trial. CC/CCA Investor—Judge Colton presided as Plaintiff's Judge in the criminal case: *State of
Tennessee V. Boaz Pleasant-Bey, 07-00471* in Shelby County Criminal Court Division III between August of
2007 and May 19th of 2010. CC/CCA's policy/custom permitting CC/CCA Investor—Judge Colton to have
financial investments with CC/CCA deprived Plaintiff of his constitutional rights to Due Process and Equal
Protection and right to an Impartial Judge, also violating the rule of *Tummy V. Ohio.* CC/CCA investor
Colton attempted to force Plaintiff to trial unprepared on May 11th, 2009 by transferring his case to CC/CCA
investor Judge Lee V. Coffee's courtroom. However, CC/CCA investor Coffee listened to Plaintiff's plea to
him on record that CC/CCA investors Parker and Bell were conspiring to suppress the LBH reports under the
State's Injury Theory, how CC/CCA investor Parker told Plaintiff to withdraw the Pro Se motion for
exculpatory evidence, and how CC/CCA investor Colton refused to have his subpoenas served to his defense
witnesses who wanted to come to trial on May 11th, 2009 and how his case was not prepared for trial.
CC/CCA investor Coffee refused to permit Plaintiff to be tried in his courtroom, recused himself from having
the case in his courtroom, and returned Plaintiff's case back to CC/CCA investor Colton's courtroom on May
11th, 2009. These events are all documented on the Shelby County Criminal Court records of the case. While
headed for trial on May 24th, 2010 , CC/CCA Investor—Judge Colton admitted to having a possibility of
prejudice in Plaintiff's case before recusing himself upon CC/CCA investor Bell's motion to recuse
transferring the case to CC/CCA investor Judge Paula Skahan's courtroom on May 20th, 2010. CC/CCA
investor Skahan heard Plaintiff's plea for the need for appointment of new legal representation and the issues
in the case concerning CC/CCA investors Parker and Bell, and she then transferred Plaintiff's case to
CC/CCA investor Judge Christopher Craft's courtroom for the case to be tried on May 24th, 2010.

CC/CCA Investor Christopher Craft

15.) From May 24th, 2010 through present day, November 2024, Defendant CC/CCA's policies/customs permitted
Judge Christopher Craft of Shelby County Criminal Court Division VIII, to have financial investments with

12

its "prison for profit" business model—while presiding as Criminal Court Judge during the pre-trial, trial, sentencing and post-trial proceedings in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division VIII. CC/CCA's investments with CC/CCA investor Craft violated the rule of *Tummy V. Ohio*, violated Plaintiff's right to an impartial judge, violated Plaintiff's rights to Due Process and Equal Protection under the law. CC/CCA investor Craft's investments with CC/CCA created a financial conflict of interest with his role as Criminal Court Judge in Plaintiff's case. CC/CCA investor Craft's financial incentive to send Plaintiff to prison for a lengthy sentence to increase his personal investments of CC/CCA's "prison-for-profit" business model negatively influenced his role as a Criminal Court Judge. CC/CCA investor Judge Craft made the following blatant prejudicial rulings, negatively prejudicing Plaintiff, directly affecting Plaintiff's criminal conviction—depriving Plaintiff of his right to a fair trial, assistance of counsel, state right to appeal as of right—unfairly prejudicing his right to liberty, violating Plaintiff's federal rights to Due Process and Equal Protection under the Laws and right to an impartial judge while presiding as Criminal Court Judge in Plaintiff's case and simultaneously having financial investments with CC/CCA and those judicial rulings were CC/CCA invested rulings in Plaintiff's criminal case as follows:

A.) On May 24th, 2010, prior to voir dire selection, Plaintiff told Judge Craft that his previous criminal defense lawyer Parker informed him he would not help him, and told Plaintiff he had to proceed Pro Se in order to obtain the suppressed LBH reports and statements from the CC/CCA investor Bell while facing prosecution under the State's Injury Theory. Plaintiff told Judge Craft several times prior to trial that he was only proceeding Pro Se because it was the "best decision" for his case under the circumstances, not because he wanted to. Despite this knowledge, Plaintiff was forced to trial Pro Se by CC/CCA investor—Craft and was wrongfully convicted of the offense charged without the assistance of counsel—then stated on record that CC/CCA investor Parker could withdraw after the conviction and he (CC/CCA investor Craft) is totally unaware of any conflicts of interests between Plaintiff and CC/CCA investor Parker. CC/CCA investor Judge Craft's personal investments with CC/CCA motivated him to sustain Plaintiff's unlawful conviction after the jury's verdict as the thirteenth juror while maintaining his personal financial incentive to have Plaintiff convicted to assist CC/CCA in creating more profits by personally handing convicting people and giving them very lengthy prison sentence to furtherance his financial investments with CC/CCA's "prison for profit" business model agenda. CC/CCA's investments with CC/CCA investor Craft deprived Plaintiff of his constitutional right to an impartial judge, to due process, to equal protection under the law, and to a fair trial, by allowing CC/CCA

13

investor Craft to have personal investments with CC/CCA's ***prison-for-profit*** business model between May 24th, 2010—present day while CC/CCA investor Craft presides as Judge;

B.) At trial, CC/CCA Investor Craft personally heard testimony of the State's complaining witness on cross-examination testify that she heard a prior statement of herself saying: "I told my mamma Boaz raped me because he said he was going to make both me and my mamma happy, but he (only) made her happy." *Ex. 1, Trial Vol. II Pg. 151* The State's child witness also testified on cross-examination that CC/CCA investor Bell sent an investigator to find a location--CC/CCA investor Bell had her identify at trial as the location of the incident, and the child witness did not know where the pictures were taken, nor did she know where the location was she identified on direct-examination by CC/CCA investor Bell—demonstrating her perjured testimony in identifying the location of the place where she alleged Plaintiff took her to commit the unlawful acts in his car;

C.) Judge Craft personally heard the State's child witness on cross-examination and re-direct examination testify that she was: "smelling his hands" as her description of her allegations of Plaintiff sexually penetrating her anus with his fingers and tongue. He also heard her cross-examination testimony deny accusing her testimony on direct-examination accusing Plaintiff of putting his tongue into her anus—directly hearing that the evidence in the case was insufficient to sustain a criminal conviction under *Tenn. Code Ann. § 39-13-522*. CC/CCA investor Craft also heard the testimony of the mother of the child witness testify that Plaintiff confessed to her on October 23rd, 2006, then heard the testimony of the medical examiner from the MSARC testify that mother of the child witness told the nurse on November 3rd, 2006 that the last time she saw Plaintiff and had contact with him was on October 22nd, 2006, demonstrating the mother of the child witness' perjured testimony that Plaintiff confessed on October 23rd, 2006 to her. Despite these major issues, CC/CCA investor Craft upheld Plaintiff's conviction and sentenced him to 23.5 years in TDOC to further his financial investments with CC/CCA;

D.) At the last day of trial, CC/CCA investor Judge Craft gave Plaintiff his Tennessee Court of The Judiciary Cuff-links to wear telling him that he could keep them if he won the trial because no one has come as close as he has to a trial in his courtroom as Plaintiff has. On the last day of the trial, CC/CCA investor Craft heard testimony of Antoinette Brittenum, owner of Memphis Business Java, Juice and Jazz—testify that the mother of the child witness told her. "That through it all, Boaz would not take a position as a polygamist, and now here he is with this other woman" as her motive to press the charges against Plaintiff with the Memphis Police Department. Judge Craft heard testimony of the mother of the

child witness testifying that she filed bankruptcy chapter 7, that the Plaintiff owned a new house in downtown Memphis with $66,000.00 of home equity in it, and she did tell his brother and Brittenum, his family and his brother that she would not press charges on Plaintiff in exchange for him signing over his house to her. She later testified that Plaintiff wanted her to have his house in contradiction to that testimony she provided on re-direct examination by CC/CCA investor Bell. CC/CCA investor Craft personally heard CC/CCA investor State's Attorney's Abby Wallace's last words in rebuttal argument for the State standing up in front of Plaintiff as he sat at the attorney's table beside the prosecutors, pointing her finger at his chest, yelling at the top of her lungs while shouting to the Jury: **"He's talking about killing her in less than five seconds! Do not hesitate to find him guilty! Guilty! Guilty as charged! Guilty! Guilty! Guilty as charged!"** CC/CCA investor Craft observed the entire trial, knew Plaintiff never testified and there was no evidence that he said such words in the case, but still upheld Plaintiff's conviction finding nothing wrong with the trial. Those shocking words yelled at Plaintiff by CC/CCA investor Wallace were strategically removed from the official trial transcripts transcribed by CC/CCA investor Betty Kee, Shelby County Court Reporter. Those mistranscribed transcripts also omitting testimony of the child witness recanting her testimony accusing Plaintiff of sexually penetrating her anus with his tongue—were  approved by CC/CCA investor Craft  who refused to correct the errors therein and were filed by the Plaintiff--in Federal Habeas Corpus proceedings and in the Supreme Court of Tennessee. Although CC/CCA investor Judge Craft allowed Plaintiff to wear his Tenn. Court of Judiciary Cuff-links on the last day of the trial because of the the likelihood Plaintiff could win the trial Pro Se, he refused to permit Plaintiff to admit any character evidence demonstrating to the jury he was a business owner, leader of a marketing team and motivational speaker  in Memphis. CC/CCA investor Craft's judicial rulings in Plaintiff's case were all influenced by his investments with CC/CCA—were blatantly geared to assist the prosecution in obtaining a conviction and were biased towards Plaintiff's actual innocence defense—preventing Plaintiff from being able to establish proof of innocence at trial. CC/CCA investor Judge Craft's personal investments with CC/CCA motivates him to refuse to provide the audio transcripts of the trial to rebut those improperly transcribed records of the trial (even though Davidson County's criminal courts provide video and audio records of the trials), improperly sustained Plaintiff's unlawful conviction because Judge Craft has a personal financial incentive to have Plaintiff convicted, helping him to make more money through CC/CCA.  CC/CCA deprived Plaintiff of his constitutional right to an impartial judge by allowing Judge Craft to have personal investments with CC/CCA.

15

E.) Judge Craft's personal investments with CC/CCA motivated him to sustain Plaintiff's unlawful conviction because of his personal incentive to have Plaintiff convicted to assist him in making additional income through CC/CCA by sentencing him to a lengthy prison sentence. Judge Craft's personal investments with CC/CCA influenced him to sentence Plaintiff to 23.5 years in the Tenn. Dept. Corr., ignoring the evidence admitted at trial of the State's complaining witness testifying she was: "Smelling Plaintiff's hands" as her definition of him sexually penetrating her anus with his fingers and tongue and her jealous motive for accusing him because he made her mother happy. *Ex. 1, Trial Vol. II, Pg. 151* CC/CCA's policy/custom permitting Judge Craft to have personal investments with its "prison for profit" business model deprived Plaintiff of his constitutional right to an impartial judge, assisted in motivating the judge to deprive Plaintiff of a fair trial, forced Plaintiff to be Pro Se, and motivated CC/CCA Investor Judge Craft to sentence Plaintiff to 23.5 years in the TDOC. In a prison for profit business model, "the more people in prison with lengthy sentences, the more profit for the business. The less people in prison with lengthy sentences, the less profit for the business."

F.) After Plaintiff filed his motion for new trial demonstrating that: (i) CC/CCA investors Abeles, Fitzgerald and Parker all encouraged him to proceed Pro Se to obtain the LBH reports while he was being prosecuted on the MSARC injury theory, encouraged him to proceed Pro Se, with the option to unwillingly plead guilty to the State's guilty plea offer, and violated his right to a speedy trial; (ii) Plaintiff scraped the skin off of his face, and that CC/CCA investor Parker celebrated his conviction after he was convicted, CC/CCA investor Craft overlooked statements made by CC/CCA investor Parker celebrating Plaintiff's conviction after the jury's verdict, upholding Plaintiff's wrongful conviction—; and (iii) State witnesses perjured testimony, insufficiency of evidence to sustain the conviction, and the jealous and financial motives of the child witness and her mother from their testimonies. CC/CCA investor Craft overruled Plaintiff's motion for new trial—finding nothing wrong with the trial in his plan to sentence Plaintiff with a lengthy prison sentence to secure his personal investments with CC/CCA's *prison for profit* business model.

G.) In Plaintiff's final motion for new trial he made it clear that the oppressive pressures of being forced to proceed Pro Se in the pre-trial proceedings in the case: *State of Tennessee V. Boaz Pleasant-Bey, 07-00471*, caused him to scrape the skin off of his face, and these facts were completely ignored by CC/CCA investor Craft. Plaintiff also timely filed a Pro Se premature notice of appeal with his motion for new trial Pro Se and CC/CCA investor Craft never forwarded that notice to the Tenn. Court of Criminal Appeals, causing Plaintiff to never have an appeal and have him incarcerated for years without

16

having the issues in his case addressed and decided by the Tenn. Court of Criminal Appeals. CC/CCA investor Craft's personal investments with CC/CCA motivates him to sustain Plaintiff's unlawful conviction because he has incentive to have Plaintiff convicted and make more money through CC/CCA. CC/CCA deprived Plaintiff of his constitutional right to an impartial judge by allowing CC/CCA investor Craft to have personal investments with CC/CCA.

CC/CCA Invested State Appellate Judges and Justices

16.) Defendant CC/CCA has customs permitting all of the Appellate Judges and Justices in the Tenn. Court of Crim. App. and Supreme Court of Tennessee in Jackson, Tennessee, to have financial investments with its "prison for profit" business model, creating financial conflicts of interest with their roles as appellate Judges and Justices for the State of Tennessee—violating the rule of *Tummy V. Ohio and Plaintiff's right to an impartial judge*. The CC/CCA invested Judges and Justices in those Tennessee Appellate Courts have made Judicial rulings in Plaintiff's case in 2013, 2014, 2015, 2016, 2017, 2018, and 2024. Their personal investments with CC/CCA affects their Judicial determination of Plaintiff's case, and has deprived him of his State right to a appeal as of right and Federal Due Process and Equal Protection rights—for the purposes of helping CC/CCA achieve its prison-for-profit business model to help their personal investments with that company. Those CC/CCA invested Tennessee Criminal Court Appellate judges and justices denied Plaintiff's pro se motions to appeal as of right, motions to waive timely filing of the notice of appeal, and deprived him of his State right to appeal, violating his right to an impartial appellate judge, due process and equal protection under the law. Plaintiff demonstrated he never waived his constitutional right to assistance of counsel and that he timely filed his premature notice of appeal with his motion for new trial Pro Se as told to him by CC/CCA investor Parker prior to Parker's withdrawal as his counsel, entitling him to an appeal under Rule 4(d) of the Tenn. R. App. P. pre-2017. Those CC/CCA invested appellate judges and justices were influenced by their personal investments with CC/CCA, unconstitutionally refused to grant Appellant an appeal as of right to hear issues in his case that would have found his criminal conviction to have been obtained without sufficient evidence. Defendant CC/CCA is solely responsible for permitting Tennessee Appellate Judges and Justices to invest in its company—subsequently causing a financial conflict of interest depriving Plaintiff of his constitutional right to an impartial judge—financially influencing them to prejudice his liberty through spiteful arbitrary judicial rulings fueled by their financial conflicts-of-interests with the CC/CCA to assist the CC/CCA achieve its prison-for-profit business model agenda.

CC/CCA Invested Dist. Atty. Gen. and Asst. Dist. Atty.

17.) From January of 2007 through present day (December 2024), Defendant CC/CCA, has customs and policies permitting District Attorney General, William Gibbons, Assistant District Attorney General Marianne L. Bell and J.R. Carter (now Judge Carter), and Abby Wallace of the 30ᵗʰ Judicial District of Tennessee, to have financial investments with CC/CCA), a company whose business model is "prison for profit", while acting as prosecuting attorneys for the State of Tennessee, during the pre-trial, trial and post-trial proceedings in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division III, VI, I, and VIII. Their investments with CC/CCA's created a conflict of interest with the interest of justice violating *Burger V. United States* establishing *a* financial incentive to send Plaintiff to prison with as much prison time while as possible by any means necessary, even if they need to suppress vital exculpatory LBH reports, create the State's Injury Theory, use perjured testimony of the child witness in identifying locations of the alleged sexual abuse and descriptions thereof, perjured testimony of her mother, unconstitutionally pressure Plaintiff into proceeding Pro Se or retain CC/CCA invested appoint counsel to represent him at trial. CC/CCA investors Gibbons, Bell, Carter and Wallace had hidden financial incentives to increase their own personal investments with CC/CCA to help it achieve its prison-for-profit business model while functioning as State attorneys working for the 30ᵗʰ Judicial District District Attorney General's Office in Plaintiff's criminal case. Defendant CC/CCA is responsible for the constitutional violations and prejudice to the liberty of the Plaintiff ensued by those persons from permitting them to invest with its *prison for profit business model*. CC/CCA investors Bell, Carter and Gibbons' financial investments with CC/CCA influenced them to relay false information to News Channel 2, 3,5, Fox News, ABC News, The Commercial Appeal , Mid South's Most Wanted, and other companies regarding Plaintiff's arrest. Those false stories told by t hem to those media companies purported that Plaintiff flew to Baltimore, was arrested after a Name Change Clerk googled his name, then called Police having him arrested while he was trying to change his name. At trial, Lt. Robinson with the Memphis Police Department ("MPD") testified that the Plaintiff was arrested in his car, driving down the street in his native city, Baltimore, Maryland.   CC/CCA investor Bell's financial investments with CC/CCA influenced her to send an investigator out to take random pictures of an abandon location and use the child witness to identify that location as the alleged place where the incident occurred. In 2017, Bell's CC/CCA financial investments influenced her to threaten the Plaintiff to withdraw his petition for writ of error coram nobis  or else she will prosecute the child witness (now a young adult woman) if he is granted a new trial, knowing he still views her as his daughter. While under duress of Bell's CC/CCA

18

motivated prosecutorial misconduct. Plaintiff withdrew the petition for writ of error of the State's witness recanting her trial testimony telling CC/CCA investor Terrell Tooten that he would rather flatten the sentence imposed than to allow Bell to ruin the child witness' life as she as ruined his life.

CC/CCA Invested Tennessee General Assembly Lawmakers

18.)  Defendant CC/CCA's policies/customs permitted all members of the Tennessee General Assembly (TGA) who agreed to pass legislation on the statute *Tenn. Code Ann. § 39-13-522* (used to indict Plaintiff in Jan. of 2007 and convict him in May of 2010), to have financial investments with CC/CCA, a company whose business model is "prison for profit". Their financial investments with CC/CCA were all in conflict with their official positions as trustworthy lawmaking government officials causing them to create CC/CCA invested laws with a financial agenda to increase the numbers of private prisons in Tennessee to increase their own personal investments with the CC/CCA prison-for-profit business model. Their personal investments with CC/CCA influenced them to frame that statute to have extremely lengthy prison sentences with language that does not require any physical evidence to sustain a criminal conviction (where words are the fundamental basis of the imposition of lengthy prison sentences). The Plaintiff was subsequently indicted, tried and convicted of that CC/CCA invested statute—created by those Tennessee CC/CCA invested lawmakers, having hidden financial investments in CC/CCA's "prison for profit business model" during the time of the statutes' enactment—creating a personal incentive for those lawmakers to create lengthy prison sentences to help with their personal investments with CC/CCA. That CC/CCA invested TGA passed the statute convicting Plaintiff, not focused on reform, but focused on lengthy prison sentences to help increase them in financial gains, disregarding the need for reform for persons convicted of that statute. In *a prison for profit business model, the more people in prison with lengthy prison sentences, the more profit*. Plaintiff is currently serving a 23.5 year prison sentence based upon that statute. That statute fails to differentiate any differences in punishment and conviction from cases that have corroborating physical evidence to support a child accusations, and those cases that do not have such evidence to corroborate and support child accusations, giving the false appearance that all persons accused, charged and convicted of that horrible criminal offense all equally deserve to be sentenced in the same manner whether they had or did not have any physical evidence to substantiate the conviction–whether the child's accusations were driven by a jealous motive—or whether the child recanted the accusations or not. The framing of that statute was solely designed as a strategy to lawfully convict persons accused of it without any proof other

19

than the complaining witness, convicting the defendant thereof giving him large amounts of prison time for the purposes of achieving the General Assembly's investments with CC/CCA to achieve the CC/CCA's business model's "prison for profit" agenda. The Tennessee Department of Treasury—is an agency of the Legislative Branch of the State of Tennessee—and a longtime CoreCivic stock holder, "with investments dating back to 1995" (Ex. 4, *Tennessean Article on CC/CCA*) owning a large portion of stock in CC/CCA— demonstrating the State's financial interest in passing laws that increase longer prison sentences—filling prison bed space—to increase the State's investments with CC/CCA's *prison-for-profit business model*. See Ex. 4, *(Tennessean Article on CC/CCA)* This agenda cannot be achieved without creating longer prison sentences for persons who are convicted of crimes in Tennessee to cause an overcrowded prison dilemma— forcing the State of Tennessee to hire CC/CCA to build new prisons and fill the prison bed space for the CC/CCA prison-for-profit business model to be achieved.

Sincerely Held Religious Beliefs

Relevant Islamic Books

19.) The Plaintiff is a Muslim who follows the "Sunnah"[2] of the Prophet Muhammad ﷺ. The Plaintiff believes in the Five Billars of Islam and the Six Articles of Faith, and believes in the Inevitable Day to Come, when the Earth's Moon and the Sun will be joined together—and the people of the Earth will be judged for their actions in the life of this world.[3] follows the Fiqh of the Shafi'ii Sunni Muslim Islamic School of Thought and believes in relying upon the knowledge of that in the religious book called, The Reliance of the Traveler to practice his religion. The Plaintiff practices Taqleed [Strictly Adherence] under the Shafi'i Mathāb [Shafi'i Islamic School of Thought], the guidelines of which are detailed in an orderly fashion in the book: The Reliance of the Traveler. The Reliance of the Traveler governs every aspect of practicing the Sunnah of the Prophet Muhammad ﷺ under the Shafi'i Mathāb and educates Plaintiff on the procedure for its practices. The Plaintiff believes that the Noble Qur'an translated by Dr. Muhammad Muhsin Khan, Formerly Director University Hospital Islamic University, Al-Madinah Al Munawwarah, is the most accurate translation of the Arabic Qur'an in English. Both the Reliance of the Traveler and the Noble

---

2The ways or the example

3   The Sun is a star—which will eventually become a Red Giant according to scientists. "The Red Giant Phase— When all the hydrogen in the core of an intermediate-mass star has fused into helium, the star has fused into helium, the star changes rapidly... The resulting compression quickly heats up the core and the region around it...The extra energy pushes against the star's outer layers, and so the star expands enormously." The World Book Encyclopedia, V. 18, Pg. 848 (2024 Ed.) According to Space.com, the Red Giant Phase of our Sun—in about 5 billion years—will cause it to burn off of the hydrogen fuel—burning helium—causing the Sun to expand, consuming Mercury, Venus and expanding to physically touch the Earth's moon. Only the Hour of Judgment is known to Allāh. But, the Qur'ān has long foretold of the time when the Sun and the Moon will be joined together. Qur'ān 75:7-12; Sahih Al-Bukhari (Prophet Muhammad is recorded to have said: "The sun and moon will be joined together on the Day of Judgment.")

Qur'an are currently banned by the edict/custom/usage of TDOC and CC/CCA from every prison in the TDOC. Currently, the Noble Qur'an and the Reliance of the Traveler are not permitted within any CC/CCA and TDOC prison, while Bibles, Torahs and other religious books are freely permitted in every CC/CCA and TDOC prison in Tennessee.

## Islamic Worship

20.)     The Plaintiff believes that group and isolated prayers throughout the day and night are essential to his beliefs as a Muslim. However, he obtains more blessings when he prays in Jama'ah [Group Prayers]. Thus, group Salah [Prayer] is mandatory in Islam and is the first pillar upon which Islam stands. "Warrkaoo' Ma'a Raki'een" [Bowing Down With Those Who Bow Down] is a Commandment enjoined upon him and Muslims from Divine Revelation from Allah, Most High ﷻ in the Qur'an. See Qur'an 2:43 Thus, corporal or group worship is Fard (obligatory) for all Muslims to fulfill the Allah's ﷻ Inherent Right, to be worshiped by His Creation. Salahul Jama'ah [Group Prayer] is said by Prophet Muhammad ﷺ to be over 25 times more beneficial with more blessings than a Salah performed isolated. Id 2(a) Plaintiff is: Prescribed by the Qur'an and Sunnah of Prophet Muhammad ﷺ to make group and corporal Salah, a minimum of five [5] times per day. Plaintiff believes he must make all five daily Salawāt [Prayers] plus additional ones such as Tawbah Salah [The Prayer of Repentance] which may be performed at any time due to the need for such a prayer through the day and night, or Salat-ul Tasbeeh [Prayer of Praise]. Plaintiff believes that Tahajud Salah [Night Prayer] with Salat-ul Witr are also mandatory for him to perform and he needs to perform them every night. The five-daily group-Islamic prayers are: Fajr [Pre-Dawn Prayer], Zhur [Afternoon Prayer], Asr [Mid-Day Prayer], Maghrib [Prayer After Sunset], and 'Isha [Night-Prayer].

## Policies Targeting Religion

### Banning Prayer

21.)     The TDOC and CC/CCA have placed substantial burdens upon the Plaintiff's religious exercise without any legitimate penological interest, implementing *TDOC Policy118.01 (C)(10)*[4], mandating Salah [Prayer] to be performed in the inmate's personal living cell during "non-work or programming times or privately throughout the day", prohibiting Salat-ul-Jama'ah [Group Prayer] in the cell, and prohibiting group prayer within the housing unit, during the night-time, and bans Salaht-ul Jama'ah

---

4 TDOC Policy 118.01

"corporate or group prayer" unless during "scheduled religious activities" in the prison chapel once per week, which does not meet Islamic requirements of five (5) times per day. The Defendants have currently prohibited the Plaintiff from being able to pray in the following areas: the prison Education Building, the prison Library, the prison kitchen, the prison gymnasium, outside during recreation times, and the housing united during in-pod recreation times, or any other time-period except during worshiping hours as prescribed by the prison chapel times. The prison chapel times are currently Fridays at 1:00 p.m. at both TCIX and SCCF. Ibid

22.)   TDOC Policy requires that the prison chaplain "...shall schedule appropriate group worship and study opportunities to meet the needs of inmates. The groups shall be inclusive and be led by the chaplain, outside clergy, or religious volunteers...inmates will not be placed in a position of religious leadership or authority over other inmates...If the chaplain or a volunteer is not available to lead a group, the following may occur:

(a)   CDs, DVDs, video tapes, or tape recordings of sermons or religious lessons which comply with policy, including but not limited to Policy#507.02, may be made available to the group.

(b)   An inmate may be authorized by the Warden/Superintendent do lead the service. Inmates may ONLY lead religious services in the presence of staff." *TDOC Policy 118.01(VI)(D)(1)-(2)((a)-(b)*

23.)   Implementation of the said policy within the TDOC, Bledsoe County Correctional Complex [BCCX], and SCCF, placing a substantial burden upon his religious exercise by:

A.)   Forcing the Plaintiff to pray during the scheduled times of the Chaplain for group worship, which are only during Fridays in SCCF and BCCX at 1:00 p.m. in the prison Chapel. Id Plaintiff is required to make group prayer at least 5 times per day: Fajr [Pre-Dawn Prayer], Zhur [Afternoon Prayer], Asr [Mid-Day Prayer], Maghrib [Prayer After Sunset], and 'Isha [Night-Prayer])

B.)   Prohibiting the Plaintiff from making individual Salah [Prayer] and Salah Jama'ah [Group Prayer] throughout the daytime, or at night time, whether the Plaintiff is in the Education Building, the prison Library, the prison kitchen, the prison gymnasium, or outside during recreation times, and the housing united during in-pod recreation times, no prayer in the living cell during count time and night time. Islamic prayer times are strictly prescribed. The Plaintiff is Ordered by the Qur'an and Sunnah of Prophet Muhammad ﷺ to make Salah a minimum of five [5] times per day: Fajr [Pre-Dawn Prayer], Zhur [Afternoon Prayer], Asr [Mid-Day Prayer], Maghrib [Prayer After Sunset], and 'Isha [Night-Prayer].

22

C.) Other Salawāt [Prayers] such as Tawbah Salah [The Prayer of Repentance] may be performed at any time due to the need for such a prayer through the day and night, or Salat-ul Tasbeeh [Prayer of Praise] and his Tahajud Salah [Night Prayer] and Witr Salah are mandatory for the Plaintiff.

D.) Salaht-ul Jama'ah [Group Prayer] over 25 times more beneficial with more blessings than a Salah performed isolated. Also, the Qur'an says: "And bow down with those who bow down" mandating Salat-ul Jama'ah [Group Prayer].

24.) TDOC Policy 118.01(c)(10) abolishes all group praying outside of religious scheduled times [in the Chapel], the scheduled approved times are on two occasions, Yawmul Jumu'ah [The Day of Friday Service] and Ta'leem [Islamic Education Service] on Sundays at 1:00 p.m. *TDOC Policy 118.01(c)(10)*

25.) Islam is the only religion currently in the TDOC that requires its believers (Muslims) to pray in organized rows and ranks within an orderly, systemic—fashion and the policies directly affect Muslims io ways other faiths do not. During Prayers, the Plaintiff is obligated to recite the Qur'an, verbally (in low tone) asking Allah for Forgiveness, Praise Allah, ask Him for Guidance and His Mercy. The Islamic Prayer consists of a Rak'ah [Unit of Systemic Routine Acts] (Standing, Bowing, Standing, Prostration, Sitting, and a Second Prostration) oral recitation of Qur'an is performed while standing in the Fajr, Maghrib and 'Isha Prayers, while Zhur and 'Asr prayers are silent. The Plaintiff follows the strict traditional injunctions taught to Prophet Muhammad ﷺ by the Angel Jibreel [Gabriel], who was Ordered by Allah ﷻ God—The Most High—to pray in that manner. Christians and other religious groups can simply bow heads, pray to themselves or in a group—avoiding the ramifications of the TDOC policy banning prayer without any disciplinary action taken. No one has ever stopped Christians from praying, only the Muslims. As a Muslim in the TDOC and CC/CCA prisons, Plaintiff risks receiving disciplinary written reports praying—spend a prescribed time-period in administrative segregation (the hole), fined with $4.00, placed on package restriction, visitation restriction, removed from the honor pod housing unit, placed in a violent pod where fights usually occur for at least 18 months and subject to other penalties if he prays against TDOC Policy 118.01(c) (10) and (d)(1)-(2)(a)-(b). Violation of these policies will result in disciplinary action per TDOC Policy. Id; *TDOC Policy 118.01(c)(10) and (d)(1)-(2)(a)-(b)*; TDOC Policy 502.05 (VI) (A) (57) and (70)[5]; and TDOC Policy 502.02 (VI) (M); TDOC Policy 502.01(VI)(L)(5)(7)(Up to 60 days in punitive segregation for each offense inmates are found guilty of); Id (5)(9)(Recommendation for

---

[5] Class A and B disciplinary offenses may be referred, at the Warden's/Superintendent's discretion, to the local district attorney general for possible prosecution. TDOC Policy 502.05(VI)(B)

reclassification); Id (5)(10) (Recommendation for dismissal from a job/program assignment); Id (5)
(12) (Reduction in pay, reduction in inmate trust fund account…")

26.) If disciplined, the Plaintiff will spend time in administration segregation (the hole), be removed from
the honor pod (a housing unit with privileges do to good behavior), charged a fee for receiving a
disciplinary infraction, placed in a housing unit where violence occurs frequently after serving the hole
—time, receive reduced pay from .34 cents to .17 cents per hour, and be prohibited from being eligible
for the Annex housing for eighteen months. Disciplinary action also removes visitation privileges as
prescribed by the Disciplinary Hearing Officer [Six, or Twelve months visitation restrictions] and
package restrictions. TDOC Policy 502.02(VI)(M) (…"in addition to any other punishments imposed,
the offender will be assessed a fee…Class B Offense-$4.00")[6]

Banning Two Religious Books

27.) The previous Commissioners of TDOC and CC/CCA issued an edict/policy/custom/procedure banning
the Sunni Muslim Fiqh[7] Book: The Reliance of the Traveler and Holy Scriptural book: The Noble Quran
translated by Dr. Muhammad Muhsin Khan from all prisons within the TDOC, including TCIX, and
SCCF where the Plaintiff is currently housed. Such an edict/policy[8]/custom/procedure places a substantial
burden upon Plaintiff's religious exercise.

28.) That edict/custom/policy/procedure implemented by TDOC and CC/CCA banning those two religious'
books from CC/CCA and TDOC prisons prevents Plaintiff from being able to practice his Deen
[Religion] with knowledge of Fiqh [Procedures] provided by those books. depriving him of having
access to information of Sacred Islamic Knowledge and the Fiqh of how he should practice his faith
properly. It further places a substantial burden on Plaintiff's religious beliefs that he needs both those
religious books to practice Islam and without those books, he is not able to do so properly.

29.) TDOC and CC/CCA implements Tenn. Code Ann. § 41-12-211. assuring that there are enough Christian
Chaplains at every prison in CC/CCA and TDOC—including Trinity Service Group [The Food Vendor
for CC/CCA]-assuring there are enough christian staff members and Bibles necessary using State and
Federal funding for every inmate in every prison in Tennessee, including TCIX and SCCF. CC/CCA and

[6]*State V. Crank*, 468 S.W. 3d 15, 30 (Tenn. 2015) (citing *T.C.A. § 4-1-407(b)-(c, (e)); Christ Church Pentecostal V. Tenn. St. Board of Equalization*, 428 S.W. 3d 800, 821 (Tenn. Ct. App. 2013) (The section defines 'substantial burden' to mean "to inhibit or curtail religiously motivated practice."') (citation omitted)
[7]Islamic Procedures and Methods of Religious Jurisprudence
[8]"Congress included customs and usages within its definition in § 1983 because of the persistent and widespread discriminatory practices of state officials in some areas of the post-bellum South…Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes V. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970)
Usage- a well-known, customary, and uniform practice. usu. In a specific profession or business.

TDOC's Act of Banning both the Reliance of the Traveler and the Noble Qur'an from every prison within the Tennessee is blatant discriminatory practice by those Defendants against Islam and establishes Christianity as the religion for the TDOC.

Banning Islamic Book Vendors

30.)   Learning Islam is an essential religious act of worship and practice for the Muslim. Reading and verbally reciting Islamic literature is also an act of worship and an essential practice of the Islamic faith promulgated by Prophet Muhammad ﷺ, TDOC has instituted a memorandum, approving the 21ˢᵗ Century Christian bookstore as the approved vendor for the TDOC, only permitting Christian books as the religious preference for the inmate population in the TDOC—and  CC/CCA has followed suit with its own version of that memorandum. Ex. 3, (CC/CCA Memorandum) In accordance with the legislative intent of Tenn. Code Ann. § 41-21-211, the TDOC and CC/CCA have not approved any Islamic book vendors for the freedom of religious practice of the Islamic religion, stopping the exercise of religious freedoms and religious speech of reading and reciting Islamic literature in accordance with the religious practice of Islam. Despite Plaintiff's requests and grievances concerning the issue, the TDOC and CC/CCA have refused to correct the matter in-house and will only appear to correct such an issue because it is now before this court in this complaint.[9] Currently, no Islamic bookstores , Makjids or vendors are approved though TDOC or CC/CCA, subsequently barring authentic Islamic books that those vendors do not carry. The TDOC and CC/CCA have refused and failed to incorporate The Islamic Bookstore, Halalaco Books, Masjid Imam Abu Hanifa, Iqra International Books, and Tayba Foundation as the Book vendors for the Islamic religion in TDOC and CC/CCA prisons in Tennessee.

Discriminatory Religious Property Memo[10]

---

9    The TDOC has demonstrated with its previous non-disclosure agreement with the Plaintiff in previous litigation—that it will violate the terms of its settlement-agreements when it believes Plaintiff is no longer housed at a prison where the lawsuit litigator is housed —demonstrating its intention is never to correct the issues before it—and the need for a trial—and/or a court order mandating it correct its unconstitutional behavior by way of injunctive relief. See *Pleasant-Bey V. Tennessee Department of Corrections, et al*., 17-cv-00174 (E.D. Tenn.) (Plaintiff had to file two motions to enforce the settlement agreement)

10   "By January 1 of each year, the Commissioner shall publish a list of religious property that inmates are permitted to have in their possession, and/or in approved group religious gatherings." *TDOC Policy 118.01(T)(D)(5)* Currently, the TDOC Religious Property Memorandum dated August 2, 2021 previously implemented by Defendant Parker, currently remains the Religious Property Memorandum for all of TDOC inmates which will likely change after the commencement of this action. Ex. 2, TDOC *Religious Property Memorandum*

31.)     Defendant TDOC CC/CCA have treated similarly situated religions other than mainstream[11] Christianity
(Baptist/COGIC/Kairos, etc.) differently, by imposing a custom/edict/usage/policy/memorandum that
only allows religions other than the mainstream Christian religions a limited amount of religious
property. Namely, that custom/edict/usage/policy/memorandum places the following limitations upon all
religions other than mainstream Christianity:

    A.) Rastafarians (13 religious items);

    B.) Wiccans (10) religious items;

    C.) Native Americans (8 religious items); and

    D.)Muslims religious property to a minimum of 4 religious' items (excluding the Hijaab for the female
        Muslimah) for male Muslims in TDOC. Ex. 2, *TDOC Religious Property Memo*

32.)     The TDOC religious property memo does not allow the Plaintiff to have Khufain (Prayer Socks),
Kifiyah (Head Scarf); non-flammable prayer oil from Medina Oil Company (Islamic Vendor); and a
Jalibil (Islamic Dress) that can be worn for prayer for Muslims. Ex. 2, TDOC *Religious Property
Memorandum*

33.)     Such limitations: (1) places a substantial burden upon the Plaintiff's religious exercise; (2) Prefers the
mainstream Christian religion above all other religions by not placing such religious property
limitations upon that religion; (3) discriminates against Islam by placing property limitations upon
Muslims, but not placing property limitations upon mainstream Christianity; (4) not including Islamic
vendors for Muslims to purchase traditional Islamic Prayer Oil, Khufain, and Jalibils. Id Khufain,
traditional Prayer Oil made by Muslims and sold by Islamic Vendors, and Jalabils are all part of the
Sunnah of Prophet Muhammad ﷺ. These are all part of the Plaintiff's fundamental beliefs.

## Deliberately Understaffed CC/CCA Prison

34.)Defendant CC/CCA understaffs SCCF—a prison high in violence and deaths—where Plaintiff is currently
housed. Due to the lack of staffing of officers. The lack of staffing at SCCF causes large amounts of
assaults and deaths at the prison—from a reign of terror. Since Plaintiff has been housed at SCCF, the
prison operates at nighttime with one officer overseeing two units of inmates—each unit housing over
two hundred inmates—and there is usually about four (4) or five (5) officers for the entire SCCF

---

11  In TDOC, Catholics are not the mainstream Christian denomination in the inmate population and are a small religious sect in TDOC.
TDOC promotes the "mainstream Christian" as being; Baptist, COGIC, Men of Valor (Sponsored by Governor Lee), Kairos, and
Southern Baptist Christian Sects.

compound. The CC/CCA operated SCCF prison does not have enough officer staff members to handle the high level of violence—and high level of drug use and overdosing from that drug use. CC/CCA's prison-for-profit business model governing the SCCF prison—decreases the amount of prison guards used in an effort to increase its profits of the company to obtain the prison-for-profit agenda of the CC/CCA business model. The less money spent to hire staff members to operate the prison—the more overall profits for CC/CCA—and the better it is for business,. However, it is more dangerous for the inmate population---which is not the concern of the CC/CCA—prison for profit is. Such an environment subjects Plaintiff to high levels of violence. See First Amended Complaint in *Pleasant-Bey V. State of Tennessee*, et al., 2020 U.S. Dist. LEXIS 24460 (M.D. Tenn.)[12] Plaintiff reserves the right to amend his complaint regarding this issue after the court's memorandum/opinion is released. Similarly situated TDOC prisons do not have the reign of terror issues as the CC/CCA operated SCCF prison does. SCCF hires incompetent elderly staff members working in the housing units who are inept when handling the normal daily incidents that occur within the SCCF CC/CCA operated prison where a reign of terror is occurring. CC/CCA's understaffing and operating its prisons treats the Plaintiff differently than similarly situated TDOC inmates housed in TDOC prisons.


### IMPORTANT UNPRECEDENTED ISSUES FOR REVIEW

Plaintiff presents important unprecedented questions of law requisite for this court to answer prior to releasing its memorandum/opinion concerning this issue as follows:


WHETHER THE CC/CCA IS PERSONALLY LIABLE FOR HAVING POLICIES/CUSTOMS PERMITTING INDIVIDUAL STATE LAWMAKERS, CRIMINAL COURT JUDGES, APPELLATE CRIMINAL COURT JUDGES AND JUSTICES, CRIMINAL DEFENSE LAWYERS, COURT REPORTERS, AND STATE'S ATTORNEY GENERALS, AS PERSONAL INVESTORS IN ITS PRISON-FOR-PROFIT BUSINESS MODEL—SUBSEQUENTLY CREATING A FINANCIAL CONFLICT OF INTEREST WITH: (A) THEIR ROLES IN THE TENNESSEE CRIMINAL JUSTICE SYSTEM, IN EITHER FRAMING LAWS, PASSING THEM, THE ADJUDICATION OF THOSE LAWS, THE REPRESENTATION OF CRIMINAL DEFENDANTS, OR THE PROSECUTION OF THEM; AND (B) THE CONSTITUTIONAL AND FEDERAL RIGHTS OF THE CRIMINALLY ACCUSED WHO ARE DIRECTLY AFFECTED BY ADVERSE ACTIONS OF THOSE CC/CCA INVESTORS, AND IF SO, IS CC/CCA PERSONALLY LIABLE FOR ANY ADVERSE ACTIONS OF THOSE INVESTORS--ACTING IN FURTHERANCE OF THE CC/CCA BUSINESS MODEL THROUGH INCARCERATION AND EXCESSIVE SENTENCING—PREJUDICIAL TO THE ACCUSED CONSTITUTIONAL AND FEDERAL RIGHTS IN CRIMINAL PROCEEDINGS. IF SO, OR IF NOT, ARE THOSE CC/CCA INVESTORS PERSONALLY LIABLE UNDER § 1983 AND DOES *HECK V. HUMPHREY* APPLY?


VII.

---

12    https://www.tennessean.com/story/news/religion/2022/05/18/trousdaleturner-tennessee-prison-muslimmmates-quran-banned/9735400002

VIII.  STATEMENT OF CLAIM

The Plaintiff respectfully declares under the penalty of perjury under the laws of the United States that the following is true and correct to the best of his knowledge and understanding and is truth as follows:

IX.  CAUSES OF ACTION
COUNT I

Violation of Fifth, Sixth, Eighth & Fourteenth Amendment Rights to Due Process, Speedy Trial, Assistance of Counsel
Without Conflicting Interests, Freedom from Cruel and Unusual Punishment,
Equal Protection, Fair Trial, and Impartial Judge,  Defamation & False Light by False Information To Media, and
Financial Conspiracy to Deliberately Undermine the Principle of Justice In Plaintiff's Criminal Case
U.S. Const. amend. V,VI, VIII and XIV

DEFENDANT  CC/CCA POLICY/CUSTOM PERMITTING THE FOREMAN OF THE SHELBY COUNTY GRAND
JURY, CRIMINAL COURT CLERK,  CRIMINAL DEFENSE LAWYERS, PROSECUTORS, JUDGES,  JUSTICES,
COURT REPORTERS, AND STATE LAWMAKERS—RELATED  TO PLAINTIFF'S CRIMINAL CASE TO INVEST
IN ITS *"PRISON-FOR-PROFIT BUSINESS MODEL"* —
CAUSING F INANCIAL CONFLICTS OF INTEREST WITH THEIR OCCUPATIONS—
VIOLATING PLAINTIFF'S FEDERAL CONSTITUTIONAL RIGHTS IN CRIMINAL PROCEEDINGS

35.) The Plaintiff reiterates paragraph 9. The following claims are brought pursuant to the discovery rule as outlined by the 6th Cir. in *Snider-Hill V. Ohio State University*, 48 F. 4th 686 (6th Cir. 2022).[13] Upon going to SCCF, a CC/CCA staff member exposed CC/CCA's hidden financial business model, informing Plaintiff that their employer, Defendant CC/CCA, has been permitting Tennessee Criminal Court Judges, criminal defense lawyers, district attorneys and lawmakers to have financial investments CC/CCA's "prison for profit" business model— while permitting them to have involvements in the Tennessee's criminal justice system through their official capacities as the Foreman of the Shelby County Grand Jury, Criminal Court Clerk, Criminal Court Judges, Lawyers, prosecutors and lawmakers—showing Plaintiff a large list of CC/CCA investors of which names of which persons are mentioned herein. CC/CCA's prison-for-profit business model directs: "the more people in prison with lengthy sentences, the more profit for the business model. The less people in prison with lengthy sentences, the less profit for the business model." This business model motivates CC/CCA to take measures to permit State legislative officials to invest in its company influencing Tennessee legislature to pass laws influenced by CC/CCA that assist CC/CCA to achieve its *prison for profit* business model agenda—establishing lengthy prison sentences in Tennessee prisons. Once the prisons become overcrowded with people having lengthy prison sentences, CC/CCA builds more private—operated prisons hired by the State of Tennessee, increasing the companies business agenda: "prison for profit", allowing the company to expand increasing profits. The more prisons to house more people, the more money CC/CCA makes!  CC/CCA Deliberately permits financial investments with persons involved in the criminal justice system and lawmakers to deliberately undermine the principle of justice for the purposes of increasing convictions with lengthy prisons sentences to achieve the company's goal of building more prisons for obtaining a greater profit.

---

13  See Memorandum of Law at ¶ 1

CC/CCA's Liability for Causing Financial Conflict of Interest With  Investors Mary F. Thomas, William R. Key, and William Gibbons While Returning Indictment Charging Plaintiff With Violating Tenn. Code of Ann. § 39-13-522

36.) Plaintiff reiterates paragraphs 9-10 herein. On Jan. 30th, 2007,  CC/CCA investors Mary F. Thomas, Foreman of the Shelby County Grand Jury returned the indictment charging Plaintiff with one count of Tenn. Code Ann. § 39-13-522 while simultaneously acting as an investor for the CC/CCA prison-for-profit business model. That indictment was signed and stamped: "FILED" by CC/CCA investor, William R. Key, Shelby County Criminal Court Clerk, who also acted as an investor in the CC/CCA prison-for-profit business model. That indictment, returned, signed by Thomas was also signed and stamped: "FILED" by CC/CCA investor Key, and signed by CC/CCA investor William Gibbons, Shelby County District Attorney General, simultaneously acting as an investor for the CC/CCA prison-for-profit business model, solidifying the indictment as a "True Bill". That indictment *State V. Pleasant-Bey, 07-00471* charged Plaintiff with one count of Tenn. Code Ann. § 39-13-522 for the purposes of helping the CC/CCA prison-for-profit business model. Thomas, Key and Gibbons all acted as investors in the prison-for-profit business model for the CC/CCA—using their jobs—to secure Plaintiff's indictment to simultaneously act as investors with CC/CCA to personally assure that their personal investments in the CC/CCA *prison-for-profit* business model to return a "True Bill" indictment as a step to securing another person in prison—masking the Tennessee criminal justice system as a venue of fulfilling the CC/CCA's prison-for-profit business model expand and grow with the return of Plaintiff's indictment. Those Defendants have deprived Plaintiff of his Vth and XIVth Amendment rights to Due Process and Equal Protection=--the right to have an indictment returned without the Foreman of the Grand Jury, Criminal Court Clerk and District Attorney General having financial conflicts of interests in returning the indictment charging him with committing an offense that has a direct link with their financial investments with a company having a prison-for-profit business model within their state if that person is convicted of that offense as charged. Their investments with the CC/CCA business model caused a  financial conflict of interest with their official occupations, being officials within the state of Tennessee criminal justice system—while having a financial incentive as investors with the CC/CCA prison-for-profit business model during the time of the return of the indictment charging Plaintiff with one count of Tenn. Code Ann. § 39-13-522.

CC/CCA's Liability for Causing Financial Conflict of Interest With Plaintiff's Lawyer Abeles

37.) Plaintiff reiterates paragraphs 9-11. From Feb. of 2007-June of 2007 Defendant CC/CCA's policies/customs permitted defense lawyer Clifford Abeles Jr. to have financial investments with CC/CCA—a company whose business model is "prison for profit", while CC/CCA investor Abeles simultaneously was appointed to represent the Plaintiff as his criminal defense lawyer—creating a financial conflict of interests—and hidden financial incentive to work against Plaintiff with an adverse goal of sending him to prison to help the CC/CCA  achieve its prison-for-profit company business model. CC/CCA investor Abeles was Plaintiff's appointed lawyer in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division IV. The CC/CCA's secret financial investments with CC/CCA investor Abeles—as he simultaneously represented Plaintiff as his criminal defense lawyer, deprived Plaintiff of his Vth, and XIVth Amend. Rights to Due Process and Equal Protection under the law, and Plaintiff VIth Amendment rights to assistance of counsel during the pre-trial

29

proceedings—establishing a financial conflict of interest between him and Plaintiff.--as he maintained his personal investments with the CC/CCA prison-for-profit business model. Also:

<u>CC/CCA's Liability From CC/CCA Investor Abele's ACTS</u>

a.  Plaintiff reiterates paragraphs 9-11. The CC/CCA investor Abeles's adverse actions as Plaintiff's criminal defense lawyer—while maintaining financial investments with the CC/CCA business model, not only violated Plaintiff's constitutional rights  (under the VIth Amendment right to assistance of counsel [without having a conflict of interest], Vth Amendment right to Due Process and XIVth Amendment right to Equal Protection), but also created a financial conflict of interest—becoming the moving force behind CC/CCA investor Abele's: (a) refusals to file a motion to dismiss Plaintiff's case as requested by Plaintiff for not having a preliminary hearing under Tenn. R. of Crim. P. Rule 5(e); and (b)refusal to request for and/or obtain known suppressed exculpatory LBH medical reports being suppressed by CC/CCA investors Gibbons, Bell, and Carter—the exculpatory evidence of which exonerated Plaintiff of  a portion of the State's Injury Theory alleging he caused injuries to the child witness hymen as found in the MSARC reports. Abeles' refusal to obtain the known suppressed exculpatory evidence caused Plaintiff to file complaints with Professional Responsibility and Abele'se—eventually forcing him withdraw as Plaintiff's Counsel based upon having a conflict of interest with Plaintiff.

<u>CC/CCA's Liability for Causing Financial Conflict of Interest With Plaintiff's Lawyer Fitzgerald</u>

38.)  Plaintiff reiterates paragraphs 9, 10, and 12. From of August of 2007-April of 2nd of 2008, Defendant CC/CCA's policies/customs, permitted criminal defense lawyer Larry E. Fitzgerald to have financial investments with the CC/CCA's "prison for profit" business model—while simultaneously representing the Plaintiff as his criminal defense lawyer, creating financial conflicting interests between him and Fitzgerald in those criminal court proceedings, creating a hidden financial incentive for Fitzgerald to have a financial motive to secure Plaintiff's conviction—causing him to be convicted and sentenced in prison to fulfill the CC/CCA's business model agenda—prison for profit—while simultaneously representing Plaintiff as his criminal defense lawyer in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division III where CC/CCA investor John P. Colton Jr. was judge.  While CC/CCA investor Fitzgerald simultaneously represented Plaintiff as his criminal defense lawyer, deprived Plaintiff of his Vth, and XIVth Amend. Rights to Due Process and Equal Protection under the law, and Plaintiff VIth Amendment rights to assistance of counsel during the pre-trial proceedings—subsequent to the financial conflict of interest between him and Plaintiff—from his personal investments with the CC/CCA's prison-for-profit business model.. Also:

<u>CC/CCA'S Liability for CC/CCA Investor Fitzgerald's Misconduct</u>

a.  The CC/CCA invested lawyer Fitzgerald's adverse actions as Plaintiff's criminal defense lawyer---while maintaining financial investments with the CC/CCA business model, not only violated Plaintiff's constitutional rights (under the Vth and XIVth amend. rights to Due Process,

and Equal Protection, and his VIth Amend. Const. right to effective assistance of counsel to be represented by counsel having no conflicting interests, and rights to a Speedy Trial and VIIIth Amendment rights to be free from cruel and unusual punishment), but it also created a financial conflict of interest—becoming the moving force behind CC/CCA investor Fitzgerald strategically—place Plaintiff in significant hardships—providing him with an uncompromising Hobson's choice to either: 1.) to waive his right to assistance of counsel to obtain suppressed exculpatory LBH reports while he was being prosecuted on the State's Injury Theory, or proceed to trial without those exculpatory LBH reports being represented by Fitzgerald who was refusing to assist him; 2.) providing Plaintiff with the option for him to unwillingly plead guilty to the guilty plea offer offered by CC/CCA investors William Gibbons and Marianne L. Bell, while refusing to obtain the suppressed LBH reports from them; or 3.) proceed to trial on April 1st, 2008being represented by Fitzgerald as a defense lawyer without the LBH reports while being prosecuted under the State's Injury Theory. Fitzgerald's actions had an apparent manifestation of his hidden financial conflict of interest between his CC/CCA investments and his representation as Plaintiff's criminal defense lawyer in the said. Fitzgerald left a negative lasting impression on Plaintiff's views of proceeding Pro Se and waiving his right to assistance in future proceedings. Fitzgerald eventually withdrew as counsel for Plaintiff having conflicts of interest as his criminal defense lawyer. CC/CCA investor Fitzgerald's oppressive representation of Plaintiff as his court appointed lawyer left a negative lasting impression upon Plaintiff—encouraging Plaintiff to later decide to proceed Pro Se and also influencing Plaintiff's decision to commit suicide in the proceedings.

<u>CC/CCA's Liability for Causing Financial Conflict of Interest With Plaintiff and His Lawyer Parker</u>

39.)  Plaintiff reiterates paragraphs 9, 10, 13 and 15(D). From May of 2008 to May 29th, 2010, Defendant CC/CCA's policies/customs permitted Tennessee criminal defense lawyer John H. Parker II, to have financial investments its "prison for profit" business model—while he simultaneously represented Plaintiff as his criminal defense lawyer—creating a financial conflict of interest that subsequently violated Plaintiff's constitutional rights in the criminal proceedings in the case: State of Tennessee V. Boaz Pleasant-Bey, 07-00471, in Shelby County Criminal Court. That CC/CCA policy/custom permitting CC/CCA investor Parker to invest in its business model —while he simultaneously represented Plaintiff as his criminal defense lawyer was the moving force that violated Plaintiff's constitutional rights in criminal proceedings in violation of U.S. Const. Amend. V, VI, VIII and XIV.

<u>CC/CCA's Liability for CC/CCA Investor Parker's Misconduct</u>

a.  CC/CCA investor Parker's financial investments with CC/CCA created a financial conflict of interest between him and the Plaintiff—creating hidden financial incentives for Parker to insidiously work against Plaintiff's actual innocence defense—in an effort to send Plaintiff to prison helping CC/CCA's prison-for-profit business model. Parker's secret financial investments with the CC/CCA ultimately became the moving force behind CC/CCA investor Parker's efforts

31

to assist the CC/CCA achieve its company's prison-for-profit business model agenda through his oppressive deficient performance as Plaintiff's appointed lawyer. CC/CCA investor Parker maintained investments with the CC/CCA prison-for-profit business model—while simultaneously representing Plaintiff as his criminal defense lawyer—forcing Plaintiff to proceed Pro Se—then becoming Plaintiff's criminal defense standby counsel—subsequent to Parker's refusal to assist Plaintiff in representing him as his lawyer—while verbally encouraging him to proceed Pro Se during the pre-trial and trial proceedings of the trial—forcing him to be Pro Se and remain Pro Se—until the current date in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, no.: 07-00471, in Shelby County Criminal Court, Divisions III, VII, I, and VIII during that time-frame. CC/CCA investor Parker's adverse actions as Plaintiff's criminal defense lawyer—while maintaining financial investments with the CC/CCA business model, not only created a conflict of interest—but was also the motivating force motivating Parker to provide oppressive deficient performance—causing Parker to act strangely in contrary to his role as a criminal defense lawyer in the above cited case by: (i) verbally refusing to assist Plaintiff to prove his innocence while being appointed to represent him as his criminal defense attorney; (ii) verbally encouraging Plaintiff to waive his VIth Amendment right to assistance of counsel to represent himself Pro Se in the pre-trial, trial and post-trial proceedings of that case; (iii) refusing to motion for known exculpatory LBH reports while scheduling Plaintiff to be prosecuted and tried in November 2008 and May 11th, 2009 to be tried on the State's Injury Theory along side CC/CCA investor Marianne L. Bell and William Gibbons; (iv) verbally telling CC/CCA investor John P. Colton Jr., Judge "And I don't want to sit there and say that the State is withholding anything" (while knowing the State was withholding the LBH reports and Plaintiff was making several requests as Parker was representing him); (v) telling CC/CCA investor Colton he had a plan to go through trial, have a negative result, then later discover the State was withholding something from Plaintiff; (vi) after convincing Plaintiff to proceed Pro Se, refusing to argue Plaintiff's motion for exculpatory evidence and encouraging Plaintiff to remain Pro Se and withdraw that exculpatory evidence motion; (vii) refusing to serve subpoenas on defense witnesses for the trial scheduled on May 11th, 2009 to discourage those witnesses from coming to trial; (viii) providing Plaintiff the option to unwillingly plead guilty while under the pressures of abovenumbers (i)-(vii); (ix) encouraging Plaintiff to file a motion for new trial and a premature notice of appeal therewith as the only necessary item for appeal—later causing Plaintiff to be subsequently denied his state appeal rights to appeal his criminal conviction; and (x) verbally celebrating Plaintiff's conviction after Plaintiff was convicted subsequent to CC/CCA investor Abby Wallace's improper and inflammatory comments made to the jury saying: "Hay Boaz! It's over with now! You're convicted! Don't drop the soap! And don't get brown on your nose!" CC/CCA investor Parker's oppressive deficient performance rooted within his financial conflicting interest as Plaintiff's lawyer ensued Plaintiff to endure psychological hardships, overwhelming abundant stress and pressures—contributing to suicidal ideations—several suicidal attempts, including hanging himself and an attempt to cut his wrist in the pre-trial, trial and post-trial proceedings of that case. CC/CCA's financial investments with CC/CCA investor Parker deprived Plaintiff of his VIth Amendment right to assistance of

32

counsel (without having a conflict of interest) and a Speedy Trial, Vth and XIVth Amendment rights to Due Process and Equal Protection under the law and his VIIIth Amendment right to be free from cruel and unusual punishment, and prejudiced Plaintiff's liberty interests by the wrongful conviction and lengthy excessive incarceration subsequent thereto.

### CC/CCA's Liability for Causing Financial Conflict of Interest With Plaintiff's Judge, Colton

40.) Plaintiff reiterates paragraphs 9,10, and 14. From July of 2007-May 20th, 2010, Defendant CC/CCA, permitted Judge John P. Colton Jr. of Shelby County Criminal Court Division III, to have financial investments with CC/CCA's prison-for-profit business model—while he simultaneously presided as a criminal court judge during the pre-trial proceedings in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division III, depriving Plaintiff of his Vth and XIVth Amendment rights to Due Process and Equal Protection and right to an impartial Judge, violating the rule of *Tunmy V. Ohio*, permitting CC/CCA investor Colton to have a conflict of interest while acting in the capacity as a Judicial Official of the State of Tennessee.

### CC/CCA Liability for CC/CCA Investor Colton's Misconduct

a.    CC/CCA investor Colton verbally told Plaintiff on May 11th, 2009, he doesn't believe defense witnesses needed to be served subpoenas, and they should just come down to the courthouse risking their jobs and livelihoods and rushed Plaintiff to trial unprepared, transferring his case to be tried in Div. VII.

### CC/CCA's Liability for Causing Financial Conflict of Interest With Plaintiff's Judge, Craft

41.) Plaintiff reiterates paragraphs 9, 10, and 15(A)-(G). From May 24th, 2010 through present-day, December 2024, Defendant CC/CCA permitted CC/CCA investor—Christopher Craft, Judge of Shelby County Criminal Court Division VIII, in Memphis, Tennessee, to have financial investments with its "prison for profit business model"—creating a financial conflict of interest between CC/CCA investor Craft and the Plaintiff—while also incentivising him to use his role as a criminal court judge for the insidious purposes of helping the CC/CCA business model achieve its prison-for-profit goal. The CC/CCA violated Plaintiff's Vth VIth, VIIIth, and XIVth Amendment rights to Due Process, Equal Protection, Assistance of Counsel, to be free from cruel and unusual punishment, to have a fair trial and an impartial judge. Also:

### CC/CCA's Liability for CC/CCA Investor Craft's Misconduct

a.    CC/CCA investor Craft is able to personally increase his own investments with the CC/CCA company prison-for-profit business model—by unconstitutionally assuring accused persons before him are criminally convicted of their offenses charged—by personally misusing his judicial capacity with prejudice to their constitutional rights in criminal proceedings—then sentencing those criminally accused subjects before him to very lengthy sentences—securing

33

the TDOC/CC/CCA prison bed-space is filled persons having very lengthy prison sentences. Once CC/CCA investor Craft helps CC/CCA's business model by personally misusing his role as criminal court judge to convict those persons and sentence them to lengthy prison sentences —he has used his role as judge to help cause the problem of overcrowding of the Tennessee prisons with accused persons before him—forcing the State of Tennessee to hire the CC/CCA to build more prisons—expanding the CC/CCA business and personally increasing his investments with the CC/CCA prison-for-profit business model. CC/CCA investor Craft's bifurcated role as an investor with the CC/CCA business model while acting as a criminal court judge in the state criminal court proceedings has hidden financial agenda to personally help the CC/CCA business model, assuring Plaintiff's conviction—over-sentencing Plaintiff with insufficient evidence to sustain the unlawfully obtained criminal conviction and sentencing Plaintiff to a lengthy prison sentence of 23.5 years in the TDOC/CC/CCA prisons, violating Plaintiff's Vth and VIth Amendment rights to Due Process and Assistance of Counsel, and XIVth Amendment rights to a fair trial and impartial judge –unjustly prejudicing Plaintiff's liberty for the purposes of helping the CC/CCA achieve its busines model goal of prison-for-profit. CC/CCA investor Craft has concealed his financial interests with CC/CCA's business model while acting in his judicial capacity during the pre-trial, trial, sentencing and post-trial proceedings in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in Shelby County Criminal Court Division VIII—between May 24th, 2010 until present day— December 2010—making CC/CCA motivated Judicial rulings in Plaintiff's case that are precalculated to assist the CC/CCA in achieving its prison-for-profit business model to fill CC/CCA's prison bed space. CC/CCA investor Craft used his Judicial capacity to unwillingly force Plaintiff to trial Pro Se, causing him to be wrongfully convicted, then over-sentencing him to 23.5 years in prison of the statute Tenn. Code Ann. § 39-13-522 during Plaintiff's trial on May 24th through May 29th, 2010. CC/CCA investor Craft oversaw the Plaintiff's trial as his judge observing (i) insufficient evidence  was used to sustain Plaintiff's conviction: (ii) perjured testimony was used by the child witness who testified she did not know where the pictures of a location she identified were taken by CC/CCA investor Bell's personal investigator; (iv) perjured testimony was used against Plaintiff by the child witness' mother— who made a reliable prior statement Plaintiff was last around the child witness on October 22nd, 2006—but she later testified that he confessed to her on October 23rd, 2006—then she made several post trial statements that she didn't believe Plaintiff was guilty of the offense; (v) misstatements and inflammatory remarks were verbally shouted before CC/CCA investor Craft by CC/CCA investor Wallace in her closing rebuttal argument for the State of Tennessee —negatively scaring the jury into convicting him of the above cited statute because she convinced the jury Plaintiff would kill the child's mother if they acquitted him; (vi) CC/CCA investor Craft then removed CC/CCA investor Parker as standby counsel at the end of the trial due to conflicts of interest he had with Plaintiff; and (vii) CC/CCA investor Craft over-sentenced Plaintiff to 23.5 years in prison of the said offense—ignoring evidence at the sentencing hearing that the child witness denied many claims at trial and gave improbable testimony accusing Plaintiff of her smelling his hands as her description of sexual penetrating

34

her; (vii) CC/CCA investor Craft saw all of these matters before him in Plaintiff's motion for
new trial, including several self-inflicted injurious matters—saw nothing wrong with the trial
—and deprived Plaintiff of his direct appeal rights by refusing to assure his premature notice
of appeal was timely filed before the Tennessee Court of Criminal Appeals after denying his
motion for new trial on December 21st, 2011.    CC/CCA investor Craft's actions were
influenced by his financial investments with CC/CCA to help the company obtain the
CC/CCA prison-for-profit business model—filling more prison beds with convicts having
longer prison sentences—which is better for CC/CCA's business model. CC/CCA's
custom/policy permitting CC/CCA investor Craft to invest in its *prison-for-profit business
model* while presiding over Plaintiff's criminal case as his judge deprives Plaintiff of his Vth
VIth, VIIIth and XIVth Amendment rights to Due Process and Equal Protection, to assistance
of counsel, to be free from cruel and unusual punishment, and the right to an Impartial Judge.
CC/CCA Investor Craft conceals the hidden financial incentive to personally make Judicial
Rulings in Plaintiff's case motivated by his CC/CCA investments—to help CC/CCA's prison-
for-profit business model financial agenda of convicting more people with longer prison
sentences to *fill more prison beds*, violating the rule of Tummy V. Ohio, permitting.
CC/CCA's custom/policy permitting CC/CCA investor Craft to have investments in its prison-
for-profit business model while acting as criminal court judge insidiously allows the CC/CCA
to infiltrate the integrity of the Criminal Justice System—through CC/CCA investor Craft who
conceals his unconstitutional financial conflict of interest with Plaintiff—while operating as an
agent assisting CC/CCA's prison-for-profit business model agenda. Those investments creates
a motive for the judge to sentence his subjects to longer-termed prison sentences to fulfill his
personal financial interests of "prison for profit" with CC/CCA.

### *CC/CCA's Liability for Causing Financial Conflicts of Interest With Plaintiff and DAG/DA*

**42.)**  Plaintiff reiterates paragraphs 9, 10, 15(D) and 17 supra. From February of 2007 until present day December
2024, Defendant CC/CCA. permitted (then) District Attorney General—William  Gibbons, Assistant District
Attorney Generals: Marianne L. Bell, J.R. Carter (now Judge Carter), and Abby Wallace of the 30th Judicial
District of Tennessee, in Memphis, Tennessee, to have financial investments with CC/CCA's "prison for profit"
business model, while simultaneously acting as prosecuting attorneys for the State of Tennessee, during the pre-
trial, trial and post-trial proceedings in the criminal case: *State of Tennessee V. Boaz Pleasant-Bey*, 07-00471 in
Shelby County Criminal Court Division III, VI, I, and VIII. Their secret financial investments with CC/CCA's
prison-for-profit business model created a conflict of interest with their roles as prosecuting officials for the State
of Tennessee, subsequently depriving Plaintiff of his Vth and XIVth Amendment rights to Due Process and Equal
Protection, rights to a fair trial and fair criminal court proceedings.

### CC/CCA's Liability for CC/CCA Investors Gibbons, Bell, Carter and Wallace's Misconduct

**a.**    CC/CCA investors Gibbons, Bell, Carter and Wallace's financial investments with the
CC/CCA's prison-for-profit business model while acting as prosecutors for the State of

35

Tennessee in Plaintiff's criminal case during that time-frame—was the driving force—influencing their actions to be motivated to obtain Plaintiff's criminal conviction by any means necessary—violating *Burger V. United States* for the purposes of helping the CC/CCA achieve its goal for its *prison-for-profit business model*-increasing their investments therewith. Their secret investments with CC/CCA disguised their prison-for-profit agendas to wrongfully convict Plaintiff of Tenn. Code Ann. § 39-12-522, even at the expense of suppressing exculpatory LBH reports—knowing Plaintiff was requesting for that evidence while being scheduled for trial three (3) times—being prosecuted on their created State's Injury Theory, psychologically affecting Plaintiff's decision to unwillingly waive his right to assistance of counsel—and make several suicidal attempts on his life. Their CC/CCA investments motivated them to use that pressure to pressure Plaintiff to unwillingly accept guilty pleas or be tried under the State's Injury Theory without that vital exculpatory evidence between Feb. 2007—May 11th, 2009 by CC/CCA invested criminal defense lawyers Clifford Abeles, Larry E. Fitzgerald, and John H. Parker. Their suppression of the LBH reports under the State's Injury Theory placed oppressive and psychological pressures and hardships upon Plaintiff in addition to him being destitute of counsel, causing him to scrape the skin off of the side of his face and make several suicidal attempts: (a) hanging himself; and (b) cutting his left wrist. Bell's financial investments with CC/CCA influenced her to send an investigator out to take random pictures of an abandon location and use the child witness to identify that location as the alleged place where the incident occurred. Bell, Carter and Gibbons' financial investments with CC/CCA influenced them to paint Plaintiff in a false light, by relaying false information to News Channel 2, 3,5, Fox News, ABC News, The Commercial Appeal, Mid South's Most Wanted, and other companies regarding Plaintiff's arrest. Those false stories told by them to those media companies purported that Plaintiff flew to Baltimore, was arrested after a (unknown) Name Change Clerk googled his name—then called Police having him arrested while he was trying to change his name. At trial, Lt. Robinson with the Memphis Police Department ("MPD") testified that the Plaintiff was arrested in his car, driving down the street in his native city, Baltimore, Maryland, clearly refuting the news propaganda of the name change arrest theory allocated by CC/CCA invested prosecutors Gibbons, Bell, J.R. Carter and Wallace. Wallace's financial investments with CC/CCA influenced her to make CC/CCA invested prosecutorial remarks to the jury—in her desperate efforts to secure Plaintiff's unconstitutional conviction—with her last words of the State's rebuttal argument, shouting at the jury, while   pointing at Plaintiff's chest standing in front of him yelling: **"HE'S TALKING ABOUT KILLING HER IN LESS THAN FIVE SECONDS! DO NOT HESITATE TO FIND HIM GUILTY! GUILTY! GUILTY AS CHARGED! GUILTY! GUILTY! GUILTY AS CHARGED!"** Wallace's CC/CCA influenced prejudicial remarks scared the jury into convicting Plaintiff, not based upon the lack of evidence in the case, but based upon the fear of the last words in her rebuttal argument to them, obtaining her secret motive to fulfill the CC/CCA's prison-for-profit agenda by convicting him of the offense  so he can be incarcerated in prison, increasing her desires for more profits therefrom. In 2017, CC/CCA investor Bell's financial investments with CC/CCA influenced her to threaten the

36

Plaintiff to withdraw his petition for writ of error coram nobis  or else she will prosecute the child witness (now a young adult woman), knowing he still views her as his daughter. While under duress of CC/CCA investor Bell's CC/CCA motivated prosecutorial misconduct, Plaintiff withdrew the petition for writ of error of the State's witness recanting her trial testimony—telling Terrell Tooten that he would rather flatten the sentence imposed than to allow CC/CCA investigator Bell to ruin the child witness' life as she as ruined his life. CC/CCA investor Bell successfully caused Plaintiff's longer incarceration in accordance with her personal desires to help the CC/CCA achieve its prison-for-profit business model to increase her personal investments therewith.

### CC/CCA's Liability for Causing Conflicts of Interests With TGA

43.) Plaintiff reiterates paragraphs 9, and  18. During the time-period the Statute *Tenn. Code Ann. § 39-13-522* was created that was used to charge Plaintiff in Jan. 30th, 2007, and convict him in May 29th, 2010. Defendant CC/CCA, permitted all members of the Tennessee General Assembly-, and the Tenn. Dept. of Treasury—to have financial investments with CC/CCA "prison for profit" business model, while they created the statute Tenn. Code Ann. § 39-13-522 which was used to indict Plaintiff in Jan. of 2007 and convict him on May 29th, 2010. The CC/CCA policy/custom permitting the TGA to have investments with its prison-for-profit business model while creating and passing that statute into law caused a financial conflict of interest with their legislative intent—and subsequently deprived Plaintiff of constitutional  and federal rights of accused persons in criminal proceedings in the case: *State of Tennessee V. Boaz Pleasant-Bey*, indictment no: 07-00471, in Shelby County Criminal Court. That CC/CCA policy/custom permitting the members of the TGA to personally invest in the CC/CCA prison-for-profit business model violated Plaintiff's XIVth Amendment rights to Due Process and Equal Protection, to an indictment not influenced by financial incentives to have him convicted and sentenced for financial gains of prison for profit under the Vth Amendment.

a.    All persons who made up the General Assembly of Tennessee at had a conflict of interest with their personal investments with CC/CCA while being entrusted as lawmakers to create laws impartially. Their personal investments with CC/CCA creates a conflict of interest, subsequently violating Plaintiff's XIVth Amendment rights to Due Process and Equal Protection under the law by being indicted, tried and convicted on a charge that was created by individuals who all had financial investments with CC/CCA at the time. Plaintiff is currently serving a 23.5 year prison sentence based upon those laws that were created and designed by a General Assembly who had personal investments with a "prison for profit" company, CC/CCA. That statute created by the General Assembly having a conflict of interest with CC/CCA investments, does not differentiate any difference in  punishment between cases in violation of that statute having corroborating physical evidence to support allegations and those cases that do not have any evidence to corroborate and support their allegations manifesting the goal in striving to fill the prison system to fulfill the interests of the personal goals of "prison for profit".

DEFENDANT CC/CCA HAS VIOLATED THE CONTINUING VIOLATION DOCTRINE
CONTINUING TO PERMIT CRIMINAL DEFENSE LAWYERS, PROSECUTORS, JUDGES, JUSTICES,
GRAND JURY FOREMAN, CRIMINAL COURT CLERKS, AND LAWMAKERS TO INVEST IN ITS
PRISON-FOR-PROFIT BUSINESS MODEL

44.) Plaintiff reiterates paragraphs 9 through 18. Defendant CC/CCA is violating the continuing violation doctrine by continuing to permit Plaintiff's previous defense lawyers: Clifford Abeles, Larry E. Fitzgerald, John H. Parker, Prosecutors Marianne L. Bell, Abby Wallace, Judge Christopher Craft, and Tennessee Criminal Court of Appeals Judges and Supreme Court of Tennessee Justices, and Tennessee State Lawmakers in the TGA to all invest in its prison-for-profit business model. Plaintiff's constitutional rights under the U.S. Const. Amend. V, VI, VIII and XIV are continuously being violated by the CC/CCA's policy/custom permitting these persons to invest in its prison-for-profit business model while maintaining an active role in the State criminal justice system.

COUNT II

Violation of First & Fourteenth Amendment Rights to the U.S. Const., Rights To Freedom of Religious Exercise, Free
(Religious) Speech, and Equal Protection Under the Law,
U.S. Const. amend. I and XIV
Violation of TRFRA & Tenn. Const. Art. 1 § 3; Violation of 42 U.S.C. § 2000cc-1(a)-(b);
T.C.A. § 4-1-407 (b) and (c)(1)-(2)

TDOC POLICY SUBSTANTIALLY LIMITING BOTH ISOLATED AND GROUP PRAYERS
WITHIN TDOC AND CC/CCA PRISONS

45.)    Plaintiff reiterates all facts asserted within paragraphs 20-26 herein. The TDOC and CC/CCA substantially

limits the Plaintiff's isolated and group prayers by enforcing the TDOC policy 118.01(C)(10) and (d)(1)-

(2)(a)-(b). That TDOC Policy violates Plaintiff's rights under Tenn. Code Ann. § 4-1-407(b), (c)(1)-(2)[14]

and 42 U.S.C. § 2000cc-1(a)-(b), U.S. Const. Amend. I[15] and the Equal Protection Clause rights of the

XIVth Amendment), requiring all TDOC prisons to follow that policy, including SCCF where Plaintiff is

housed. That policy has barred Plaintiff from making both isolated and group prayers outside of the

religious times as scheduled inside of the prison chapel at SCCF. The religious times for prayer at SCCF

are only scheduled on Friday's at 1:00 p.m. The Plaintiff risks facing disciplinary action if violates that

TDOC Policy 118.01(C)(10) and Id (d)(1)-(2)(a)-(b), that are being enforced without any legitimate

penological interest.[16] No other religion is affected by this prayer policy from TDOC except the

practitioner of Islam, due to the manner in which traditional Salah is performed, causing the enforcement

of that policy to be disparative in treatment against Islam and discriminatory in its implementation against

that religion and its practitioners.--permitting other religions to pray without violating that policy, but not

permitting Muslims to equally do the same. Moreover, the following substantial burdens are placed upon

the Plaintiff's beliefs of mandatory group prayers—suppressing that group religious exercise by the

enforcement of that TDOC policy by both TDOC and CC/CCA, TDOC Policy 118.01(C)(10) and (d)(1)-

(2)(a)-(b) at SCCF by:

A.)    Mandating that Salah [Prayer] be performed in the cell [place of housing] during "non-

work or programming times or privately throughout the day", banning all prayer

during the night-time, and banning Salaht-ul Jama'ah ("corporate or group prayer")

unless during "scheduled religious activities" in the prison chapel, which is only

Fridays at 1:00 p.m. *TDOC Pol. 118.01(C)(10) and (d)(1)-(2)(a)-(b);*

---

14 These State statutes allow for government departments and officials to be sued for violating religious freedoms.
15 During prayer, the Plaintiff recites Surahs [Chapters of the Qur'an], a form of religious speech, which subsequently violates the Free
Speech Clause of the First Amendment, along with the Free Exercise Clause of the First Amendment.
16 TDOC Policy 502.02 (VI) (M); Ex.6, TDOC Policy 502.05 (VI)(A)(57) & (70) (Defining Refusal of A Direct Order as a Class C: The
willful refusal to follow and carry out a specific, authorized, written or verbal directive."); TDOC Policy 502.05 (VI)(A)(70)(Defining
Violation of TDOC/Institutional Policies...Class B or C Disciplinary Infraction as: "Failure to comply with written rules governing
inmate behavior. The incident report shall cite the TDOC policy or institutional policy violated, including policy section and subsection
numbers.")

B.)    Using that policy to prohibit Plaintiff from making individual Salah [Prayer] and

Salaht-ul Jama'ah [Group Prayer] at work, in the education department, in the library,

during his recreation time (inside or outside), in the housing units, the dinning hall,

and individual prayer inside his living cell during night time because:

    i.)    The Plaintiff is prescribed by the Qur'an and Sunnah of Prophet Muhammad

ﷺ to make Salah a minimum of five [5] times per day. Other Salawāt

[Prayers] such as Tawbah Salah [The Prayer of Repentance] which may be

performed at any time due to the need for such a prayer through the day and

night, or Salat-ul Tasbeeh [Prayer of Praise] and his Tahajud Salah [Night

Prayer] cannot perform those prayers due to the enforcement of TDOC

Policy 118.01(C)(10) and (d)(1)-(2)(a)-(b) as promulgated and implemented

by TDOC and CC/CCA at SCCF;

    ii.)    The Plaintiff risks disciplinary action for praying in violation of TDOC

Policy 118.01(C)(10) and (d)(1)-(2)(a)-(b). He can, and will, be sanctioned

with a disciplinary report, placed in the hole, charged a fee for getting a

disciplinary report, removed from the honor pod, relocated in a violent

housing unit, and lose pay raises. Disciplinary offenses also subject to

penalties of visitation restrictions and package restrictions for a period of

time as prescribed by the Disciplinary Hearing Officer;

    iii.)    Salaht-ul Jama'ah [Group Prayer] is said by Prophet Muhammad ﷺ to be

over 25 times more beneficial with more blessings than a Salah performed

isolated individually. The Qur'an says: "And bow down with those who

bow down" (Qur'an 2:43) which is a Spiritual Mandate from Allah for all

Mu'minūn [Believers in Allāh] to make Salaht-ul Jama'ah [Group Prayer].

Plaintiff believes in mandatory group prayer for this reason. However, the

said TDOC Policy abolishes all group pray outside of religious scheduled

times [in the Chapel], which is only once per week, Yawmul Jumu'ah

[Friday Service] at 1:00 p.m. in SCCF, making other prayers that the

Plaintiff chooses to make impossible without disciplinary action;

    iv.)    The Plaintiff is limited to making only one weekly group prayer as

scheduled by the prison chaplain, required by TDOC Policy 118.01(c)(10)

and (d)(1)-(2)(a)-(b), which is only Fridays at 1:00 p.m. at SCCF. Due to these prescribed two mandatory time-periods, they prohibit the Plaintiff from making Salat-ul-Jama'ah for all five daily prayers prescribed by Allah ﷻ and Prophet Muhammad ﷺ ;

v.) During Prayers, the Plaintiff is obligated to recite the Qur'an, verbally ask Allah for Forgiveness, Praise Him, ask Him for Guidance and His Mercy. The Islamic Prayer is physical worship of Standing, Bowing and Prostration, oral recitation of Qur'an, audible and silent praises to Allah. Banning prayer subsequently bans the freedom of religious exercise and the freedom of speech within the prayer.

41

COUNT III

Violation of First Amendment Rights to the U.S. Const., Rights To Freedom of Religious Exercise, Freedom of Religious Speech, & Establishment Clause, Right to Receive Information & Ideas, and Fourteenth Amendment Rights to Due Process & Equal Protection
Violation of TRFRA & Tenn. Const. Art. 1 § 3; Violation of 42 U.S.C. § 2000cc-1(a)-(b)
T.C.A. § 4-1-407 (b) and (c)(1)-(2)

TDOC'S CUSTOM/USAGE/ADAGES THAT COMPLETELY BANS
THE RELIANCE OF THE TRAVELER & THE NOBLE QUR'AN FROM TDOC AND CC/CCA PRISONS

46.) The Plaintiff reiterates all claims previously asserted within paragraphs 19, and 27-28 herein. Defendants TDOC and CC/CCA both placed a substantial burden upon the Plaintiff's religious exercise, violated his rights under the Establishment Clause, violated his First Amendment rights to receive information and ideas, and discriminated against the Plaintiff's religious beliefs, violating U.S. Const Amend. I and XIV § 1; 42 U.S.C. § 2000cc-1(a)-(b)[17]; Tenn. Const. Art. 1 § 3; and T.C.A. §4-1-407 (b) and (c)(1)-(2); and violated Plaintiff's right to Due Process under the XIVth Amendment by:

A.) Banning the Sunni Muslim Fiqh Book: *The Reliance of the Traveler* from every prison in the TDOC and CC/CCA, including TCIX and SCCF without a legitimate penological interest. The Reliance of the Traveler is essential to the Plaintiff practicing his religion according to the Sunnah of the Prophet Muhammad ﷺ and without it, Plaintiff is unable to effectively do so;

B.) Banning the Noble Qur'an from all prisons in the TDOC, including TCIX and SCCF where the Plaintiff is currently housed. Plaintiff believes the Noble Qur'an is the best translation of the Arabic Qur'an in English and those Defendants have deprived him of accessing it; and

C.) Complying with Tenn. Code Ann. § 41-12-211, assuring that there are enough Bibles purchased using State and Federal funding in every prison in the State of Tennessee, including TCIX and SCCF for every inmate in the prison to have—while banning both the Reliance of the Traveler and the Noble Qur'an from those prisons–refusing to equally apply that statute for the Qur'an as applied for Bibles. The Defendants refuse to use State and Federal funding to purchase equal amounts of Qur'ans for the TDOC and CC/CCA prisons in accordance with that statute. That statute is being implemented in a religiously discriminatory manner in violation of Plaintiff's First Amendment and XIVth Amendment rights and Tenn. Cost. Art. I. § 3, and by prohibiting the free speech of those religious books, which is also an Islamic act of worship.

---

17 The State of Tennessee can be sued under RLUIPA and TRFRA—for the religiously bias Statute. Tenn. Code Ann. § 41-12-211.

COUNT IV

Violation of First & Fourteenth Amendment Rights to the U.S. Const., Rights To Freedom of Religious Exercise, Right to
Receive Information & Ideas, and Equal Protection Under the Law
U.S. Const. amend. I and XIV
Violation of TRFRA & Tenn. Const. Art. 1 § 3; Violation of 42 U.S.C. § 2000cc-1(a)-(b)
T.C.A. § 4-1-407 (b) and (c)(1)-(2)

TDOC RELIGIOUS PROPERTY MEMORANDUM ENFORCED BY BOTH TDOC & CC/CCA VIOLATES
FREEDOM OF RELIGIOUS EXERCISE, VIOLATES THE ESTABLISHMENT CLAUSE &
TREATES ISLAM DIFFERENTLY THAN OTHER SIMILARLY SITUATED RELIGONS AND MAINSTREAM
CHRISTIANITY

47.) Plaintiff reiterates paragraphs 21-33 herein. Defendants TDOC and CC/CCA placed substantial burdens upon
Plaintiff's religious exercise, by implementing the statewide TDOC Religious Property
Memorandum/EDICT/CUSTOM/USAGE/POLICY that substantially limits Plaintiff's access to religious items
and materials in comparison to similarly situated religions within the CC/CCA and TDOC prisons—giving
preferential treatment to mainstream Christianity by excluding that religion from its descriptions—and by
substantially limiting items and materials Muslims can have, violating Plaintiff's rights under U.S. Const.
Amend. I, Free Exercise, and Establishment Clause; First Amend. Right to receive information and ideas; U.S.
Const. Amend. XIV; Tenn. Code Ann. § 4-1-407(b) and (c)(1)-(2) and 42 U.S.C. § 2000cc-1(a)-(b) by:

(a) Prefers the mainstream Christian population's as the religious preference over Islam in TDOC and
CC/CCA prisons—by the memorandum's exclusion of mainstream Christianity from its premises—
subsequently protecting Christianity and inmate practitioners thereof from having property limitations
and restrictions upon their religious items within the TDOC and CC/CCA prisons. Ex. 2 (TDOC
Religious Property Memo Not Listing Mainstream Christians, but mentioning Catholics, a minor
Christian sect in TDOC and other religions)

(b) Treating Islam differently than similarly situated: a) mainstream Christians; b) Rastafarian; c)
Wiccans; and d) Native American religions—by substantially limiting religious property items for
Muslims within the TDOC and CC/CCA prisons to only possess a small limited amount of religious
property while not requiring any limitation on the mainstream Christian religion of TDOC and
CC/CCA staff members and inmates, and allotting more religious items for the Rastafarian, Wiccan,
and Native American religions in comparison to the Islamic faith, violating the Plaintiff's RLUIPA,
XIVth Amendment Equal Protection rights, First Amendment rights to Freedom of Religious
Exercise and Establishment Clause rights and rights under T.C.A. § 4-1-407(b) and (c)(1)-(2).
Specifically, that custom/edict/usage/policy/memorandum only allows:

1.) Muslims religious property to a minimum of 4 religious' items[18] for male Muslims in TDOC.
*Ex. 2, TDOC Religious Property Memo*

However, that TDOC memorandum/custom/edict/usage/policy does allow the following larger number of
religious items for the following religions in comparison to Muslims:

1.) Rastafarians (13 total religious items);

---

18Excluding the Hijaub for the female Muslimah because the Plaintiff is a male. In Islam, males do not wear Hijabs.

43

2.) Wiccans (10 total religious items;) and

3.) Native Americans (8 total religious items) Id,

(c) In addition to this fact, that TDOC custom/edict/usage/policy/memorandum further places a substantial burden on the Plaintiff's religious exercise because it does not allow the Plaintiff to possess the Sunnah Khufain (Prayer Socks worn by Prophet Muhammad ﷺ); Kifiyah (Head Scarf); and Jalibil (Islamic Dress, also worn by Prophet Muhammad ﷺ); and does not allow Plaintiff to purchase prayer oil from Madina Islamic Oil Company, or from an Islamic vendor according to his beliefs. Id Those stringent limitations from the said TDOC custom/edict/usage/policy/memorandum treats Islam differently than similarly situated Rastafarian, Wiccan, and Native American religions that are allowed a larger number of religious items. Moreover, the unnamed TDOC majority Christian population's religion is not mentioned within that TDOC custom/edict/usage/policy/memorandum, which does not limit them to the constraints of only being allowed to possess a certain number of religious items.

That TDOC Memorandum subsequently:

1. Violates the Freedom of Religious Exercise and Establishment Clauses of the First Amendment, by: (a) preventing the Plaintiff from purchasing and receive donations of Khufain from Islamic Vendors; (b) preventing the Plaintiff from purchasing traditional Halal Prayer Oil from Islamic Vendors as traditionally practiced by Sunni Muslims; and (b) preferring the mainstream Christian inmate population religion above all others by not giving them any limits on their religious items in comparison to Islam and other minority religions in TDOC;

2. Violates the provisions of 42 U.S.C. § 2000cc-1(a)-(b) without a compelling governmental interest for doing so; (3) violates T.C.A. § 4-1-407(b) and (c)(1)-(2) and Tenn. Const. art. 1, § 3[19]

---

19Normally, Tenn. Const. is not actionable, but the statute provides relief under Tenn. Const. art. 1, § 3. See T.C.A. §4-1-407(a)(2) (Providing protection under both Tenn. Const. art. 1, § 3 and U.S. Const. amend. I) Also See Memorandum of Law In Support of Complaint for case law research supporting more protection under Tenn. Const. art. 1, § 3

COUNT V

Violation of First and Fourteenth Amendment of the U.S. Constitution—Rights to: Freedom of Religion, to Receive
Information & Ideas, the Freedom of Religious Exercise, Freedom of Religious Speech and Establishment Clause Rights,
and Equal Protection
Tenn. Const. Art. 1 § 3; Violation of 42 U.S.C. § 2000cc-1(a)-(b) and T.C.A. § 4-1-407 (b) and (c)(1)-(2)

TDOC AND CC/CCA'S BAN ON ISLAMIC BOOK VENDORS AND RELIGIOUS DISCRIMINATION—
PROVIDING PREFERENTIAL TREATMENT TO CHRISTIAN BOOK VENDORS
AFTER ISSUE RAISED BY PLAINTIFF THROUGH IN-HOUSE ADMINISTRATIVE REMEDIES

48.) Plaintiff reiterates paragraph 30 herein. Defendants TDOC and CC/CCA have both barred Islamic Book
Vendors from TDOC and CC/CCA prisons by implementing a memorandum certifying 21st Century
Christian Bookstore as the official book store for those prisons—subsequently barring all other book
vendors from those prisons—negatively excluding Islamic book vendors from all TDOC and CC/CCA
prisons. Islam, unlike Christianity requires several cognizable areas of Fiqh and 'Ilm [Knowledge] books to
gain a proper understanding, because Islam is not just a religion, but properly practiced, it becomes one's
way of life. That memorandum has deprived the Plaintiff of access to the following religious book vendors
requisite to obtain an accurate understanding of Islam, depriving him of his:

a. First Amendment right to the Freedom of Religion, by forcing him to have to choose Christianity
   from Christian book vendors as his only source of religious books;

b. First Amendment right to the Freedom of Religious Exercise and Religious Speech—because
   reading and reciting Islamic educational materials is an act of worship in Islam;

c. First Amendment rights to receive information and ideas, by barring Islamic book vendors—
   excluding them from the memorandum for TDOC/CC/CCA prisons;

d. First Amendment Establishment Clause rights, by forcing the 21st Century Christian book vendor as
   the only religious book vendor for the inmate population in the State of Tennessee's TDOC and
   CC/CCA prisons that can be purchased by inmates and their family members; and

e. Fourteenth Amendment Equal Protection rights, by treating similarly situated christian inmates
   differently with more favorable treatment than Muslim inmates—depriving Muslim inmates of the
   ability to purchase religious books of their choosing—while permitting Christian inmates to
   purchase religious books of their choosing Plaintiff is not permitted to purchase religious books
   from: The Islamic Bookstore, Halalaco Books, Tayba Foundation, Iqra International, Masjid Imam
   Abu Hanifa, and The American Arab Message from TDOC and CC/CCA prisons. Defendants
   TDOC and CC/CCA have both issued memorandums approving 21st Century Christian Books as the
   approved religious vendor for the CC/CCA and TDOC, refusing to incorporate Islamic book vendors
   within the official memorandum—effectively religiously discriminating against the religion of
   Islam, barring all Islamic books from the CC/CCA and TDOC prisons in Tennessee.

45

## COUNT VI

Violation of Eighth Amendment Cruel & Unusual Punishment, Fourteenth Amendment Due Process and Equal Protection Rights

CC/CCA SCCF PRISON VIOLATES THE EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION BY UNDERSTAFFING ITS PRISON TO ACHIEVE ITS *PRISON-FOR-PROFIT* BUSINESS MODEL AT THE EXPENSE OF THE ENDANGERMENT OF THE SAFETY AND SECURITY OF THE INMATE POPULATION IN COMPARISON TO SIMILARLY SITUATED TDOC-OPPERATED PRISONS

49.) Plaintiff reiterates paragraph 34 of this complaint. Defendant CC/CCA has deliberately understaffed its prisons to achieve its prison-for-profit goal—undermining the security interest of the institution of SCCF, endangering the Plaintiff's safety and security. The reign of terror , high level of assaults and deaths at the SCCF demonstrates that the lack of staffing precalculated by the CC/CCA to enhance its profits for the prison-for-profit business model of the corporation. CC/CCA's intentional lack of staffing violates Plaintiff's Eighth Amendment rights to be free of cruel and unusual punishment by subjecting him to a reign of terror with a lack of staffing and elderly officers working in the housing units who are incapable of physically responding to incidents that occur on a daily basis. CC/CCA treats its inmate population differently than similarly situated TDOC inmates who are housed in prisons that are better staffed—and have competent staff members within the housing units capable of adequately responding to issues that normally occur in daily prison life. For this reason, similarly situated TDOC prisons do not normally have uncontrollable reign of terror as the CC/CCA SCCF and Trousdale prison does. This violates Plaintiff's Eighth Amendment and Fourteenth Amendment Due Process and Equal Protection Clause rights.

X.    RELIEF

The Plaintiff demands the judgment against the Defendants TDOC and CC/CCA for the following:

1.) For Count 1, violation of Plaintiff's Vth, VIth, VIIIth, and XIVth Amendment rights to Due Process, Speedy
Trial, Assistance of Counsel, Freedom from Cruel and Unusual Punishment, Equal Protection, Fair Trial,
Impartial Judge, Defamation and False Light, Plaintiff demands:
   a)   Monetary relief in an amount to be determined at trial;
   b)   Compensatory Damages;
   c)   Punitive Damages;
   d)   Punitive Damages for emotional and mental distress and anguish from pressures causing suicidal
        ideation and attempts;
   e)   Declaratory Relief;
   f)   Protection against being retaliated by those Defendants and all their subordinates for filing this action
        (including protection from being transferred in retaliation);
        f.a.)   Reimbursement of costs for the court fees, copies and mailing expenses associated with this
        action, the typing, editing, and data-entry fees of the business: The Pleasant-Bey Legal Initiative—
        From: The Pleasant-Bey Files;
        f.b.)   Separate attorney fees from any pro bono counsel; and

        f.c.)   Any other relief this Court deems just and proper.

2.) For Count II, violation of Plaintiff's 1st and 14th Amendment Rights, Freedom of Religious Exercise, Freedom of
Religious Speech, and Equal Protection , Violation of TRFRA & Tenn. Const. Art. 1 § 3; T.C.A. § 4-1-407 (b) and
(c)(1)-(2), Plaintiff demands:
   a)   Monetary relief in an amount to be determined at trial;
   b)   Compensatory Damages
   c)   Punitive Damages
   d)   Punitive Damages for emotional and mental distress and anguish from not being able to pray and
        practice religion of choice;
   e)   Injunctive Relief
   f)   Declaratory Relief
   g)   Protection against being retaliated by those Defendants and all their sobordinates for filing this action.
   h)   Reimbursement of costs for the court fees, copies and mailing expenses associated with this action
        paid for by The Pleasant-Bey Legal Initiative—From: The Pleasant-Bey Files.
   i)   For violation of 42 U.S.C. § 2000cc-1(a)-(b), Plaintiff demands injunctive and declarative relief; and
   j)   Separate Pro Bono Attorney fees

3.) For Count III, violation of Violation of Plaintiff's First Amendment Rights to the U.S. Const., Rights To Freedom
of Religious Exercise & Establishment Clause, Right to Receive Information & Ideas, and Fourteenth Amendment
Rights to Due Process & Equal Protection , Violation of TRFRA & Tenn. Const. Art. 1 § 3;  and T.C.A. § 4-1-407
(b) and (c)(1)-(2) the Plaintiff demands:
   a)   Monetary relief of an amount to be determined at trial;
   b)   Compensatory Damages
   c)   Punitive Damages
   d)   Punitive Damages for emotional and mental distress and anguish from not being able to pray and
        practice religion of choice;
   e)   Injunctive Relief;
   f)   Declaratory Relief;
   g)   Protection against being retaliated by those Defendants and all their subordinates for filing this action
        (including, but not limited to protection from being transferred and harassed by TDOC staff members);
   h)   Reimbursement of costs for the court fees, copies and mailing expenses associated with this action
        paid for by The Pleasant-Bey Legal Initiative—From: The Pleasant-Bey Files; and
   i)   Abrogation of challenged policies and modified policies that do not place substantial burdens upon his
        religious exercises;
   j)   Declaratory and Injunctive  relief for violation of 42 U.S.C. § 2000cc-1(a)-(b); and
   k)   Separate Pro Bono Attorney Fees

47

4.) For Count IV, violation of First & Fourteenth Amendment Rights to the U.S. Const., Rights To Freedom of Religious Exercise, Right to Receive Information & Ideas, and Equal Protection Under the Law U.S. Const. amend. I and XIV Violation of TRFRA & Tenn. Const. Art. 1 § 3; and T.C.A. § 4-1-407 (b) and (c)(1)-(2), the Plaintiff demands:

    a) Monetary relief in an amount to be determined at trial;
    b) Compensatory Damages;
    c) Punitive Damages;
    d) Punitive Damages for emotional and mental distress and anguish from not being able to pray and practice religion of choice;
    e) Declaratory Relief;
    f) Protection against being retaliated by those Defendants and all their subordinates for filing this action (including protection from being transferred in retaliation);
    g) Declaratory and Injunctive relief for violation of 42 U.S.C. § 2000cc-1(a)-(b)
        g.a.) Reimbursement of costs for the court fees, copies and mailing expenses associated with this action paid for by The Pleasant-Bey Legal Initiative—From: The Pleasant-Bey Files; and Separate Pro Bono Attorney Fees

5.) For Count V, Violation of First and Fourteenth Amendment   of the U.S. Constitution—Rights to Receive Information & Ideas, To Freedom of Religious Exercise, and Establishment Clause Rights, and Equal Protection Tenn. Const. Art. 1 § 3; and T.C.A. § 4-1-407 (b) and (c)(1)-(2), Plaintiff demands:

    a) Monetary relief in an amount to be determined at trial;
    b) Compensatory Damages;
    c) Punitive Damages;
    d) Punitive Damages for emotional and mental distress and anguish from not being able to pray and practice religion of choice;
    e) Declaratory Relief;
    f) Protection against being retaliated by those Defendants and all their subordinates for filing this action (including protection from being transferred in retaliation);
    g) Declaratory and Injunctive relief for violation of 42 U.S.C. § 2000cc-1(a)-(b)
        g.a.) Reimbursement of costs for the court fees, copies and mailing expenses associated with this action paid for by The Pleasant-Bey Legal Initiative—From: The Pleasant-Bey Files; and Separate Pro Bono Attorney Fees

6.) For Count VI, violation of Violation of Eighth Amendment Cruel & Unusual Punishment, Fourteenth Amendment Due Process and Equal Protection Rights, Plaintiff demands:

    a) Declaratory and Injunctive relief
    b) Separate Pro Bono Attorney Fees

Respectfully Submitted,

Plaintiff/Pro Se
Boaz Pleasant-Bey, No.: 473110
The Pleasant-Bey Legal Initiative—
From: The Pleasant-Bey Files
555 Forrest Avenue
Clifton, Tenn. 38425



48

### Declaration

I, <u>Boaz Pleasant-Bey</u>, declare under the penalty of perjury under the laws of the United States that the foregoing

is true and correct to the best of my knowledge and understanding. This Action has been Executed this 30th day

of _____ 2024.

Plaintiff/Pro Se
Boaz Pleasant-Bey #473110
The Pleasant-Bey Legal Initiative



### Certificate of Service

I, <u>Boaz Pleasant-Bey</u>, certify that a copy of the foregoing has been mailed to the U.S. District Court Clerk,

Federal Building, 107 N. Main Street, Memphis, Tenn. 38103, and to the U.S. Attorney General's Office, on this 30th

day of _____ 2024 (2024)

### Certificate of Publication

This document and all related documents were typed, edited, and printed with the services of the registered

business: *The Pleasant-Bey Legal Initiative, From: The Pleasant-Bey Files*, a Business registered with the Hickman

County Clerk's Office in Tennessee. The cost of the preparation of these documents related hereto is: $3, 500.00, which

does not include the typing, editing and data-entry services by that company in future related proceedings.